*In re* MARRIAGE OF ROBIN SANTA CRUZ, n/k/a Robin Croson, Petitioner-Appellee, and NOEL SANTA CRUZ, Respondent (Judith Rea, n/k/a Judith Wolff, Intervenor-Appellant).

Second District   No. 2—87—1050

Opinion filed August 1, 1988.

Robinson & Skelnik, of Elgin (Mary Robinson, of counsel), for appellant.

Bonnie M. Wheaton, of Wylie, Wheaton & Associates, P.C, of Wheaton (Carole J. Grahn, of counsel), for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

Intervenor, Judith Rea, n/k/a Judith Wolff, appeals from the judgment of the circuit court of Du Page County finding she did not have standing under section 601 of the Illinois Marriage and Dissolution of Marriage Act (the Act) (Ill. Rev. Stat. 1987, ch. 40, par. 601(b)(2)) to petition for custody of her granddaughter, Judith Christianne Rea.

The marriage of petitioner, Robin Santa Cruz, f/k/a Robin Rea and n/k/a Robin Croson, and defendant, Noel Santa Cruz, was dissolved in September 1985. Petitioner was four months' pregnant with the couple's only child at that time. The judgment of dissolution explicitly reserved the issues of child support and visitation; no award of custody was included in the judgment. Christianne was born on January 28, 1986, while petitioner was residing in Wheaton with her mother, the intervenor here, and Norman Wolff, whom intervenor married in August 1986.

These parties continued to reside together there until February 27, 1987, when petitioner left the residence after an argument with the intervenor. On March 6, 1987, the intervenor filed a petition for custody of Christianne, and emergency temporary custody of Christianne was awarded to intervenor on that date. An emergency *ex*

*parte* order of protection also entered that day restrained the petitioner from "striking, threatening, harassing, or interfering with the personal liberty" of either intervenor or Christianne. These same restrictions were included in a subsequent agreed order of protection entered on March 25, along with the provisions that petitioner remove her automobile from intervenor's premises, that the intervenor would provide petitioner with her personal belongings from the residence at 2 p.m. on that date, that the petitioner could enter the premises for no purpose other than to remove her automobile, and that the petitioner was directed to return Christianne's two baby books which contained her medical records.

Pursuant to intervenor's petition, an order of default was entered against petitioner on April 28. *Inter alia*, the court's order recited it found intervenor had standing to pursue custody of Christianne and granted intervenor permanent custody of Christianne to the exclusion of petitioner and respondent. This default order was later vacated as to respondent, Noel Santa Cruz, pursuant to his motion. He filed an emergency petition for temporary visitation and was given leave to file a petition for custody or visitation. The cause was set for hearing on July 1, but respondent's counsel was allowed to withdraw on June 23, and the record reflects no further action on defendant's petition.

Petitioner also moved to vacate this default order and subsequently filed a motion to dismiss intervenor's custody petition pursuant to section 2—615 of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—615) on the ground intervenor did not have standing. After review of the parties' memoranda of law, the court found intervenor's petition was sufficient to state a cause of action inasmuch as the allegation that intervenor was in "sole custody" of Christianne allowed the inference that neither one of her parents was in custody of her.

Petitioner filed her answer, and, over petitioner's objection, the court granted intervenor's petition for an order of conciliation and ordered the petitioner and intervenor to participate in conciliation. The court also ordered intervenor to have Christianne available within seven days for supervised visitation with the petitioner on a weekly basis.

Following receipt of the conciliator's report, intervenor moved that the parties submit to a mental examination at intervenor's expense. The motion was denied, as was intervenor's motion for reconsideration, and the court issued intervenor a rule to show cause why she should not be held in contempt for her failure to have Christianne available for supervised visitation with petitioner as previously or-

dered. Intervenor's subsequent motion to allow an interlocutory appeal pursuant to Supreme Court Rule 308 (107 Ill. 2d R. 308) and for change of venue was denied.

When the cause came on for trial on October 23, the court determined that proof of intervenor's standing to pursue the cause was lacking, and it scheduled a hearing as to that issue for November 6.

On that date, the court vacated its prior default judgment against petitioner, and an evidentiary hearing on the matter of intervenor's standing was held. At the conclusion of the hearing, the court found the intervenor did not have standing to pursue custody of her granddaughter under section 601 of the Act. (Ill. Rev. Stat. 1987, ch. 40, par. 601(b)(2).) It ordered custody of Christianne be given to petitioner as soon as possible and denied intervenor's motion for stay pending appeal. On November 19, this court granted intervenor's motion for stay, and, according to petitioner's petition for custody filed on November 23, Christianne was removed from petitioner's custody by intervenor on November 21 and, as far as may be ascertained from the record, presently continues to reside with intervenor.

At the evidentiary hearing on standing, the intervenor testified that she was 46 years old and that she was petitioner's mother and the grandmother of 21-month-old Christianne. Christianne had lived with her in her home in Wheaton since birth; petitioner and Norman Wolff lived there as well.

Intervenor testified that on February 27, she and petitioner argued about why petitioner had been out so late. The argument lasted only a few minutes, and intervenor stated she told petitioner to calm down and went to take a shower. When she got out of the shower, intervenor found petitioner was gone. Intervenor later saw petitioner outside with a small bag which she assumed contained some of petitioner's personal belongings. Petitioner stood at a neighbor's driveway; intervenor called to her, but got no response. As intervenor crossed the yard toward petitioner, a car came up; petitioner got in and the car left. Petitioner said nothing to intervenor about where she was going or where she could be reached. She took none of Christianne's things.

The following morning, petitioner called intervenor and, laughing, asked intervenor if she had calmed down yet. Petitioner did not tell intervenor where she was or give her any idea as to how she could be reached. Intervenor next saw petitioner on March 2, 1987. Petitioner was accompanied by a police officer. Petitioner and the officer were admitted at the back door of the residence. Intervenor testified petitioner walked past Christianne, who was sitting in her high chair,

through the kitchen down the hallway and into her room, where she began collecting personal belongings. Petitioner was at the residence about 45 minutes collecting clothes, cosmetic articles, books and personal effects from her room and the downstairs storage area. Petitioner took Christianne's baby books as well. Intervenor testified petitioner said nothing to her about Christianne and did not take Christianne that day. Intervenor stated she made no representations to petitioner regarding any court proceedings at that time. Petitioner gave intervenor no information about where she would be staying or how she could be reached.

Intervenor next spoke to petitioner when petitioner called on March 10. Petitioner asked what intervenor had done with respect to Christianne, and intervenor told her she had found an attorney, that they had gone to court, and that she had temporary custody of Christianne. Petitioner asked why that was done, and intervenor told her it was best to protect and secure Christianne. Petitioner told intervenor that she would kill her. During the conversation, petitioner said nothing about her intentions with respect to Christianne, and she left no information as to where she was staying or how she could be reached.

On cross-examination, intervenor testified that she married Norman Wolff on August 22, 1987. Her argument with the petitioner on February 27 was not their first argument. Her phone conversation with petitioner on February 28 ended by both of them hanging up on each other. Intervenor testified she was out of the house with Norman and Christianne from about mid-morning until late afternoon on February 28. When asked if she had had any conversation with petitioner while petitioner was at the house on March 2, intervenor said she asked petitioner what she was doing and whether she would stop and think about what she was doing. Intervenor acknowledged that she was in court on March 6 seeking a temporary custody order and that she signed a criminal complaint on March 11 alleging that petitioner had come on her property on that date in violation of the order of protection.

On redirect, intervenor testified that at no time from February 27 until March 6 did petitioner let intervenor know where she could be reached or express any intentions with respect to Christianne. Intervenor testified that in the past, petitioner had left home for extended periods. On re-cross-examination, intervenor admitted that petitioner had not left home since Christianne's birth.

Wheaton police officer Robert Peterson testified that on February 28 he was dispatched to meet petitioner at intervenor's residence pursuant to a phone call petitioner made asking for assistance while she

removed some personal belongings from the house. At the house, petitioner knocked on the door and rang the bell, but got no response. Peterson testified petitioner peered in the window at the front and walked around to the rear of the house. Petitioner stated she knew "she" was there, but no one would answer the door. According to Peterson, there was no evidence one way or the other to indicate whether "she" was or was not home.

Peterson was dispatched for the same purpose on March 2. Intervenor was home when he and petitioner met at the residence on that date. Peterson advised intervenor why they were there, and he remained at the house while petitioner removed her clothing, some furniture items, and a stereo, among other personal belongings. Peterson recalled that petitioner advised intervenor that she was going to take all her belongings at that time and she would come back for the child later. He also recalled that intervenor told petitioner that there was an emergency court proceeding going on or going to take place, and that she (intervenor) was going to get custody of Christianne. Peterson said he was not shown any court order. He was aware petitioner had left in the past. To his knowledge, petitioner did not take the child from intervenor's residence on March 2. On cross-examination, Peterson stated intervenor made the comment to petitioner that she was in the process of getting an emergency court order to get custody of Christianne and that petitioner was an unfit mother and should not have her back. Peterson testified Robin was upset by intervenor's comment, and petitioner stated she was going to get the baby back.

The Wolff's next door neighbor, Joann Becker, testified that on February 27 she was at home in the evening with her two oldest daughters. Petitioner came over about 11 p.m. and was talking with Becker's daughters in the living room. Petitioner was upset and crying, and Becker asked what was wrong. Petitioner said she had to leave intervenor and Norman's home. Becker asked where the baby was, and petitioner said she was next door with intervenor. Petitioner said nothing else.

While at the Becker's home, petitioner made a phone call, and Becker learned it was to Michelle and Carol Morgan. Petitioner went next door for a few minutes and then returned to Becker's. Michelle and Carol Morgan pulled into the driveway, and petitioner left with them. Becker stated that petitioner said she was not taking Christianne with her; petitioner expressed no intention to Becker with respect to Christianne.

On cross-examination, Becker stated she was awakened when she

heard people in her living room. Petitioner was crying and very agitated. Petitioner calmed down after she made the phone call.

Intervenor's husband, Norman Wolff, testified he was feeding Christianne in the kitchen on March 2 when he saw petitioner at the back door with Officer Peterson. Peterson asked that petitioner be allowed to come in to gain her personal possessions. Wolff stated that petitioner walked in with her head down and immediately went towards the back of the house. She never looked up and never said anything. He was aware that she was gathering her possessions and that she did remove them. Wolff stated petitioner made no voice comments whatsoever and never even looked at the child. Petitioner did not take Christianne on that occasion and neither spoke to nor looked at him. He did not hear petitioner request the child from intervenor, and he himself never spoke to petitioner. Petitioner did not attempt to take the child from him in any way, and she made no request whatsoever.

Intervenor presented no more witnesses, and petitioner moved for a directed finding. Following argument, the court entered its order finding intervenor had no standing, and this appeal followed.

The issues presented are: (1) whether the court erred in determining intervenor did not have standing to petition for custody; (2) whether the court erred in denying intervenor's petition for mental examination; and (3) whether the court erred in denying intervenor's motion for change of venue.

Intervenor contends the court erred in finding she did not have standing where the evidence supports the conclusion that petitioner did not have physical custody of Christianne. Intervenor further asserts the court erred in raising the standing issue *sua sponte*, in placing the burden of proof of standing on her rather than on the petitioner, and in refusing to consider any circumstances occurring or existing after intervenor's petition for custody was filed. Petitioner responds that Illinois case law clearly supports the trial court's finding that intervenor lacks standing under the facts adduced at the hearing.

■ ■ The paramount right of a natural parent to the care, custody and control of his or her child has been recognized in Illinois. (*In re Custody of Townsend* (1981), 86 Ill. 2d 502.) Other than proceeding under the comparatively strict standards of the Adoption Act (Ill. Rev. Stat. 1987, ch. 40, par. 1501 *et seq.*) or the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1987, ch. 37, par. 801—1 *et seq.*; see, *e.g., In re Custody of Menconi* (1983), 117 Ill. App. 3d 395, 396), a nonparent may obtain custody of a child by means of a petition filed under section 601(b)(2) of the Illinois Marriage and Dissolution of Marriage Act

(Ill. Rev. Stat. 1987, ch. 40, par. 601(b)(2)). That section provides:
"A child custody proceeding is commenced in the court:

\* \* \*

(2) by a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, *but only if he is not in the physical custody of one of his parents.*" (Emphasis added.) Ill. Rev. Stat. 1987, ch. 40, par. 601(b)(2).

■ It has been established that "physical custody" does not turn on who has physical possession of the child. *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 53-54 (agreeing with *In re Custody of Menconi* (1983), 117 Ill. App. 3d 394, and *In re Custody of Barokas* (1982), 109 Ill. App. 3d 536).

Several Illinois cases have considered the issue of whether a child is in a person's "physical custody" under section 601 of the Act, and the determination has included consideration of factors such as how the child came to be in the nonparent's physical possession and the duration of the possession. In the only Illinois Supreme Court decision which considered this issue, *In re Custody of Peterson* (1986), 112 Ill. 2d 48, the natural parents of the minor were divorced in February 1983 and custody of the couples' minor daughter, who was born in August 1981, was awarded to the mother. Although it was unclear when the mother and minor began living with the maternal grandparents, they lived there until the mother died in May 1984 as the result of a long and disabling illness. The father, who lived nearby and had exercised his visitation rights as to the minor twice a week, asked the grandparents after the funeral for custody of his daughter, and the grandparents refused. Both parties filed petitions for modification of custody.

The trial court's grant of the father's motion to dismiss the grandparents' petition for lack of standing was reversed on appeal, and the supreme court reversed that judgment. The supreme court considered that during the time the mother and child lived with the grandparents, the mother had legal and physical custody of the child. The fact the grandparents assisted the mother in taking care of the child did not effect a transfer of physical custody to the grandparents, inasmuch as the mother and child were never separated for an appreciable period and, thus, the mother never lost physical custody. The child came to be in the sole care of the grandparents only by virtue of the fortuitous occurrence of the mother's death. The court determined that after the mother's death, the child must be considered, within the meaning of section 601(b)(2) of the Act, to have been in the physi-

cal custody of her father and, therefore, the grandparents did not have standing. *Peterson*, 112 Ill. 2d at 54-55.

The *Peterson* court relied on two prior appellate court cases in determining that standing under section 601(b)(2) did not turn on who is in physical possession of the child at the time of filing of the petition for custody: *In re Custody of Barokas* (1982), 109 Ill. App. 3d 536, and *In re Custody of Menconi* (1983), 117 Ill. App. 3d 394.

In *Barokas*, the natural mother of a 15-year-old girl placed her in the temporary care of the girl's adult sister while the mother searched for a new apartment. The girl resided with her sister from May 28, 1980, until June 3, 1980. On that date, she was removed from the sister's home by a couple who had befriended her in the past in light of her and her mother's violent arguments and the girl's allegations of physical abuse and her desire to run away from home. The next morning the couple filed an emergency petition for custody, and the mother filed a special appearance and motion to dismiss the cause for lack of jurisdiction since nonparents may petition for custody only if the child is not in the physical custody of one of her parents.

The court determined the mother was entitled to an evidentiary hearing on the jurisdiction and standing issue before proceeding to a consideration of the merits of the custody petition. The court stated:

> "We are not convinced under the circumstances of this case that the manner in which petitioners acquired the child satisfied the standing requirement of section 601(b)(2). Overnight contact with third parties fails to fulfill the statutory provision that the child not be in the physical custody of one of her parents. A parent's 'actual possession and control of a child' (Ill. Rev. Stat. 1979, ch. 40, par. 2103.08) is not lost every time the child visits or spends a vacation with a relative or friend. We do not accept petitioners' theory that physical custody may be relinquished by default if a parent performs the task of parenting in a less than adequate manner. Petitioners cannot deprive respondent of physical custody of her child so as to acquire standing under section 601(b)(2) by taking the child from the home of her adult sister where respondent had placed her." *Barokas*, 109 Ill. App. 3d at 544.

In *Menconi*, a father placed his two-month-old daughter in the care of his parents after his wife died in December 1974. From that time until April 1981, the child lived for the most part in the care and custody of her grandparents. The child was returned to the father at his request several times during that period, but only for short intervals, the longest being several weeks. In April 1981, the father forc-

ibly removed the child from the grandparents and refused to return her. Four days later, the grandparents filed a petition for custody under section 601(b)(2) of the Act.

The trial court rejected the father's jurisdictional challenge and denied his motion to strike and dismiss. After a hearing on the merits, the court awarded permanent custody of the girl to the grandparents. On appeal, the court's judgment was affirmed. Determining the grandparents had standing, the court considered the fact that the father had voluntarily relinquished physical custody of the girl to them by his intentional act of placing her with them and the lengthy period thereafter when the girl became integrated into their home and enjoyed a mother-daughter relationship with the grandmother. The court found the lapse of four days between the time of the abduction and the filing of the custody petition was insufficient to reinvest the father with physical custody so as to deprive the grandparents of standing.

In 1987, three more cases were decided which involved the issue of whether a nonparent had standing to petition for custody. In the first to be decided, *Montgomery v. Roudez* (1987), 156 Ill. App. 3d 262, the 14-year-old mother, who was herself a ward of the Illinois Department of Children and Family Services, relinquished the care and custody of her newborn son to the defendant, who was the young mother's great-aunt. Two months later, because she could not go on public aid and have her own apartment without her baby, the mother filed a *habeas corpus* proceeding seeking physical custody of him. Her great-aunt counterpetitioned for custody under section 601(b)(2) of the Act. After a lengthy trial, the great-aunt was awarded permanent custody of the child.

On appeal, the mother challenged her great-aunt's standing to maintain the action for the child's custody. The great-aunt was found to have standing where the record showed the mother voluntarily relinquished custody of the child when, immediately following his birth, she executed a document analogous to a final and irrevocable consent to adoption form which surrendered her custodial rights over the child until he reached the age of 18. There were no allegations of fraud or collusion which may have voided the mother's relinquishment of custody and shown that the great-aunt had wrongful custody. Accordingly, the court concluded the great-aunt had legal physical custody of the child.

In *In re Custody of McCarthy* (1987), 157 Ill. App. 3d 377, the natural parents were divorced and custody of the two minor children given to the mother. Five months later, the mother died in a car acci-

dent, and three days later, on July 15, 1985, the father filed an emergency affidavit and petition seeking temporary and permanent custody of the minors. On that same date, the court granted custody of the minor children to their maternal aunt until July 24. On July 22 the minors' maternal aunt, her husband, and the minors' maternal grandparents petitioned for custody of the minors under section 601(b)(2) of the Act. The father did not raise the question of standing until nine months of an 11-month continued hearing on the merits of the custody issue had passed, the court had heard testimony on 16 different days, and rebuttal witnesses had been presented. The trial judge granted the father's motion to dismiss and ordered the minors be transferred to him.

On appeal, this court reversed and remanded, finding the father waived his right to object to the third-party petitioners' standing by failing to make a timely motion to dismiss and, given the procedural history of the case, found that the petitioners were severely prejudiced by the court's granting of the late motion to dismiss.

■ Although not necessary to our decision, we considered whether the petitioners had standing under section 601(b)(2) and found that they had proved that the minors were not in the physical custody of their father. Our finding was based on what "has long been law in Illinois that the death of a custodial parent after a final divorce judgment has been entered does not automatically revert custody to the surviving parent. (*Milenkovic v. Milenkovic* (1981), 93 Ill. App. 3d 204, 212.)" (*McCarthy*, 157 Ill. App. 3d at 383.) We also considered that although the trial court had ample opportunity to transfer custody of the minors to the father, it did not and, instead, awarded it to the minors' maternal aunt.

In *In re Custody of O'Rourke* (1987), 160 Ill. App. 3d 584, the minor girls and their brother, who became an adult and was not involved in the appeal, were placed in the custody of their mother in 1981 when their parents were divorced. The mother died in 1985 after a lengthy illness during which illness the minors' maternal aunt and uncle traveled from Wisconsin to Lockport on weekends for 14 months to help care for the mother and minors. After her death, the mother's relatives acceded to the father's request that the children be turned over to him. The father filed a petition to modify custody, and the aunt and uncle along with another maternal aunt filed a petition to intervene pursuant to section 601(c) of the Act. That section provides in part that in child custody proceedings, "[t]he court, upon showing of good cause, may permit intervention of other interested parties." Ill. Rev. Stat. 1987, ch. 40, par. 601(c).

In finding that the trial court did not abuse its discretion in denying the intervention, the court considered that upon the mother's death, physical custody of the children transferred to their father as in the *Peterson* case. Thus, because the maternal aunt and uncle would not have been able to petition for the minors' custody under the provisions of section 601(b)(2), it could not say the trial court abused its discretion in dismissing their petition to intervene. Interestingly, the *O'Rourke* court noted the *Peterson* court's finding that the minor children were considered to be in the physical custody of the surviving natural parent upon the death of the custodial parent was a departure from earlier cases which had held that such an event does not automatically revert custody to the surviving parent. Our *McCarthy* judgment concerning whether the petitioners there had standing was premised on one of these "earlier cases." *Milenkovic v. Milenkovic* (1981), 93 Ill. App. 3d 204; *McCarthy*, 157 Ill. App. 3d at 383.

Intervenor here contends the circumstances of the separation of the petitioner and Christianne in the instant cause are unlike the "fortuitous occurrences" in *Peterson* and *O'Rourke*, where the mother died, and unlike *Barokas*, where the mother temporarily enlisted the aid of the minors' adult sister to assist her in caring for the child and the minor was unlawfully removed from the adult sister. Here, intervenor asserts that petitioner made a conscious decision to "walk away" without making any arrangements for the child's care, without expressing any intention with respect to the child, and without indicating where she could be reached. Thus, she asserts, the instant cause is more like *Menconi* and *Montgomery* where the natural parents voluntarily relinquished custody of their children to the persons who then petitioned for custody.

Petitioner vehemently decries intervenor's characterization of her as having simply "walked away" from Christianne where, she asserts, the facts show she made repeated attempts to retrieve Christianne along with her personal belongings and her separation from Christianne was caused solely by the wrongful, unlawful and malicious detention of the child by the intervenor. In her reply, intervenor stands by her characterization of petitioner's actions as a voluntary relinquishment of Christianne where, she asserts, the evidence fails to support petitioner's assertions that she made immediate attempts to reunite with her daughter or that intervenor did anything unlawful or wrongful to sabotage any such attempts.

▪ Although we believe petitioner's argument presents an all-too-favorable view of the evidence, we nevertheless cannot agree with in-

tervenor's position that the evidence shows petitioner voluntarily relinquished physical custody of Christianne to her.

In our opinion, the evidence shows that the petitioner did not "walk away" from Christianne; rather, petitioner walked away from her mother, intervenor here. Petitioner was not voluntarily relinquishing custody of Christianne; she was relinquishing residence in the home of intervenor and her husband. When she announced her intention to gather up her personal belongings and return for the child later, it must reasonably be inferred that petitioner meant to relinquish Christianne's residence there as well. Four days after petitioner made known her intentions to remove Christianne from intervenor's home, intervenor had secured in an *ex parte* hearing court-ordered emergency temporary custody of Christianne and an order enjoining petitioner from contact with either Christianne or intervenor. Intervenor's petition for this emergency temporary custody alleged, *inter alia*, that petitioner "has a demonstrated history of erratic and irrational behavior" and that intervenor "reasonably fears that the petitioner *** will flee the jurisdiction of the court should she have physical possession of the minor child."

Under the circumstances shown by the record and the evidence in this cause, we conclude that petitioner had physical custody of the child at the time intervenor filed her petition for custody. Thus, intervenor did not have standing under section 601(b)(2) to commence the child custody proceeding.

■ Petitioner does not respond to intervenor's further contention it was error for the court to consider the matter of her standing *sua sponte*. Nevertheless, we find no merit in intervenor's contention.

The circumstances of the standing issue here are unlike those in *McCarthy*, where the issue was not raised until the 11-month continued hearing on the merits of the custody issue had all but concluded. Petitioner's initial challenge to intervenor's standing was presented in a timely motion to dismiss pursuant to section 2—615 of the Civil Practice Law. (Ill. Rev. Stat. 1987, ch. 110, par. 2—615.) The court determined that the allegations of the petition were sufficient to state a cause of action under section 601(b)(2) of the Act. In subsequent pleadings filed prior to the trial on the merits of the custody issue, petitioner reasserted her challenge to intervenor's standing to petition for custody, and the court, recognizing that no evidentiary hearing had been held on the matter, ordered that this be resolved before reaching the merits of the custody issue. (*Cf. Barokas*, 109 Ill. App. 3d at 544 (respondent entitled to evidentiary hearing on jurisdiction and standing issue before proceeding to a consideration of the merits

of the custody petition).) It is well established that where standing is lacking, it is inappropriate to consider the merits of the claim raised. (*Harris Trust & Savings Bank v. Duggan* (1983), 95 Ill. 2d 516.) We conclude the court did not err in proceeding thusly.

■ We also find no merit in intervenor's contention the court erred by imposing the burden of proof of standing on her. Although lack of standing has been deemed an affirmative defense as we noted in *McCarthy* (157 Ill. App. 3d at 383), petitioner's motion to dismiss here was framed under section 2—615 of the Civil Practice Law, not section 2—619. (Ill. Rev. Stat. 1987, ch. 110, pars. 2—615, 2—619; *cf. O'Rourke*, 160 Ill. App. 3d at 585 (where the court determined it would not regard the father's motion to dismiss the petition to intervene due to petitioners' lack of standing to be the equivalent of a section 2—619 motion).) Further, language in *Peterson, Menconi, Montgomery, O'Rourke*, and even our *McCarthy* case indicates that the nonparent bears the burden of demonstrating that he or she has standing to commence the custody action. (*Peterson*, 112 Ill. 2d at 53; see also *In re Custody of Peterson* (1984), 129 Ill. App. 3d 887, 892-93 (Romiti, J., dissenting); *Menconi*, 117 Ill. App. 3d at 395-96; *Montgomery*, 156 Ill. App. 3d at 265; *O'Rourke*, 160 Ill. App. 3d at 586-87 (referring to *Peterson*); *McCarthy*, 157 Ill. App. 3d at 383; *cf. Barokas*, 109 Ill. App. 3d at 544 (where, upon respondent's motion to dismiss and accompanying affidavit, the court found she was entitled to a hearing and an opportunity to present evidence on the jurisdiction and standing issue).) This considerable burden is imposed in order to promote the " 'twin policies favoring the superior rights of natural parents to the custody of their children. and of fostering greater stability in the home environment by deterring abductions and other unilateral removals of children' " and comports with the rationale of the concept of standing in general, *i.e.*, "that a party may commence an action only if he can demonstrate sufficient personal interest in the outcome of the litigation." *Peterson*, 129 Ill. App. 3d at 893 (Romiti, J., dissenting).

■ Finally, it is clear from the record that intervenor did not object at the hearing to the court's imposition of the burden of proof upon her. It has been held that when it is contended that the procedure of the trial court is in error, failure to object to such procedure in the trial court precludes its review. *Hargrove v. Gerill Corp.* (1984), 124 Ill. App. 3d 924.

The record also shows intervenor did not object at trial to the court's failure to consider any of the circumstances occurring or existing after her petition for custody was filed as a factor supporting a

finding that she had physical custody of Christianne. Consequently, as above, intervenor has waived consideration of this issue here. Moreover, the circumstances of the instant cause distinguish it from our *McCarthy* case where the father never had custody of the children after his divorce, and where, although the court had ample opportunity to do so, it did not transfer custody of them to him after the mother's death but, instead, transferred it to the maternal aunt. Here, petitioner had physical custody of Christianne from the time of her birth, and not only was intervenor granted temporary custody of Christianne on an *ex parte* basis, an order of protection was entered against petitioner as well which restrained her from contact with Christianne.

We affirm the judgment of the circuit court of Du Page County. Intervenor's remaining two issues are moot and need not be addressed inasmuch as the cause did not and will not proceed to a hearing on the merits of the intervenor's petition for custody.

Affirmed.

LINDBERG, P.J., and WOODWARD, J., concur.