NO. 4-97-0235

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In Re:  the Marriage of ) Appeal from

CARA L. RUDSELL, ) Circuit Court of

Petitioner-Appellant, ) Mercer County

and ) No. 95D20

ERIC L. RUDSELL, )

Respondent, )

and )

CHRYSTAL J. MILLAGE and WILLIAM D. ) 

MILLAGE, )

Intervenors-Appellees, )

and ) Honorable

LOUIE WOOD and JUDITH WOOD, ) James J. Mesich,

Intervenors. ) Judge Presiding.

_________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

On May 31, 1995, Chrystal Millage filed a petition to modify custody in these proceedings, in which Eric and Cara Rudsell had previously been divorced and the custody of their daughter, Elizabeth, had been awarded to Cara.  The circuit court first found that Chrystal and her husband William had standing pur­su­ant to section 601(b)(2) of the Illinois Marriage and Disso­lution of Marriage Act (Act) (750 ILCS 5/601(b)(2) (West 1994)), and then on Janu­ary 14, 1997, modi­fied its previous order and awarded custody of Eliza­beth to them.  Cara ap­peals.  We af­firm.

Cara and Eric Rudsell were mar­ried July 6, 1990.  Two chil­dren were born during the mar­riage, Heath­er, Au­gust 1, 1991, and Eliz­abeth, January 20, 1993.  In March 1992, Heather entered the hospital with bronchial pneu­mo­nia.  After her re­lease, Cara

turned Heather over to Cara's par­ents, Louie and Ju­dith Wood, be­cause Cara did not have heat in her home.  Cara took Heather back for a time, but when Heather reentered the hospi­tal, Cara again turned Heather over to the Woods.  Judith testi­fied that at first Cara visited Heather every Sunday, but visitation fell off to maybe once a month in the winter­time.  Some­times Cara took Heath­er for periods of several weeks, but then would call and ask the Woods to pick Heather up, without giving any explanation.  Heath­er re­mained with the Woods until April 1995.  

Cara met William and Chrystal Millage in 1991 through Eric, who was a friend of the Millages' son.  Eric lived with the Millages in early 1992, and Chrystal testified she fed Eric and Cara "most every night" while Cara was pregnant.  Eliz­a­beth was born by ce­sar­e­an sec­tion.  Be­fore the birth, Cara asked Chrystal to take care of the baby for several weeks while she recuperated, and Chrystal agreed.  Chrystal tes­ti­fied she of­fered to let Cara stay with them as well, but Cara de­clined.  Chrystal testi­fied that, when Elizabeth was two weeks old, Cara took her for an over­night but brought her back the next day and said "You can have this damn brat from hell, she bawled all night, the next thing I had her, shaking her."  Cara de­nied that.   

Elizabeth remained with the Millages after Cara had recovered from the operation.  Cara tes­ti­fied she did not re­trieve Eliz­a­beth be­cause Eric had be­come vio­lent and abu­sive.  Eric told Cara to choose between him and Eliz­abeth.  That is also why Cara had left Heath­er with the Woods.  Cara stat­ed Eric was not Elizabeth's natu­ral fa­ther, and he re­sent­ed the child's pres­ence in the home.  Eric later told Chrystal he might be the child's natural father, and the trial court de­cided, for pur­pos­es of these pro­ceedings, that it would as­sume Eric is Elizabeth's natu­ral father.  

In the months after Elizabeth was born, Cara vis­it­ed the Millages two or three times per week and occasionally took Eliza­beth to the Woods' home.  Ju­dith tes­ti­fied she saw Eliz­a­beth with Cara every weekend early in the year she was born, but as sum­mer ap­proached, the vis­its de­creased to around two per month.  Chrystal likewise testi­fied Cara's visi­ts became less fre­quent, with peri­ods of over a month between visits at one point.  Cara took Eliz­a­beth and stayed with the Woods for al­most a week in Sep­tem­ber 1993, perhaps also in September 1994.  

In February 1994, Cara and Eric took Eliza­beth to a bar in the evening.  Judy Stocks, an acquaintance of Eric and Cara, was pres­ent.  She tes­ti­fied Cara ar­rived be­tween 7:30 and 8 p.m. and stayed until 10 p.m.  Stocks tes­ti­fied Elizabeth's cloth­ing and face were dirty.  Stocks called Wil­liam Millage, who came and took Eliz­a­beth home.  Stocks asked Cara why Elizabeth was still with the Millages, and Cara replied the trail­er needed to be cleaned up, the power was off, and it was too cold.  Stocks tes­ti­fied she asked Cara, "Why did­n't she go and get her *** or was she just going to give Eliza­beth to them?"  According to Stocks, Cara replied, "What dif­fer­ence does it make?  They al­ready have her."  Cara tes­tified she would have to "figure some­thing out" before Eliza­beth started school.

The Millages took Eliza­beth on vaca­tions out of state, with Cara's permis­sion.  Initial­ly, Cara took Elizabeth to the doctor as necessary.  Later Chrystal took Elizabeth to the doc­tor, us­ing pub­lic aid Cara received for Elizabeth's health care.  Chrystal asked Cara's permission be­fore tak­ing Eliz­a­beth to the doc­tor.  Cara provided no financial sup­port for Elizabeth, other than one bag of old clothing, and food stamps until Eliz­abeth was one year old.

Cara testified she told Chrystal several times she was going to get Elizabeth when she was ready, and Chrystal said that's fine, you can come get her when you want to.  Cara said she was gullible to believe that.  Ju­dith Holmgren pre­pared a home study of Cara, the Wood house­hold, and the Millage house­hold on behalf of Lu­ther­an Social Servic­es.  The Millages stated they did not in­tend to seek cus­tody when Eliz­a­beth first entered their home.  How­ever, Chrystal told Holmgren that they had since bonded with the child and wanted to keep her.  Wil­liam told Holmgren that Cara and the Woods would get the child "over my dead body."  Carolyn Geertz, Chrystal's mother, tes­ti­fied the child re­lat­ed to Chrystal as if Chrystal were her moth­er.

According to Holmgren's report, the Millages had had prior expe­ri­ence with fos­ter chil­dren.  Chrystal's par­ents had two foster children who were re­turned to their biologi­cal par­ents.  Chrystal wrote a letter to the biological parents stating she would help the mother, if Chrystal would be al­lowed to have some sort of rela­tionship with the children.  The two chil­dren wound up living with Chrystal for one year.  The natu­ral mother visited every other weekend until a so­cial worker con­vinced the natural mother she should retrieve the chil­dren.  The children were later returned to foster care, for which the natu­ral mother blamed the Millages.  Chrystal told Holmgren the Millages never "went the legal route with Eliz­a­beth" because their experi­ence made them afraid of scaring Cara.

Chrystal testified Cara did not see Elizabeth over Christmas 1994 or on Elizabeth's birthday in January 1995.  Cara testified she at­tempt­ed to con­tact Eliz­a­beth on her birthday, but the Millages were not home.  She tes­ti­fied she gave Elizabeth her birth­day and Christmas gifts later in Janu­ary, when she and Eliz­abeth vis­it­ed Cara's parents.  According to Chrystal, Cara vis­it­ed the Millages only five times from Janu­ary to April 1995.  In February 1995, Cara left Eric and moved from the trail­er home to a house in Bald Bluff, Illinois, where she began living with a man named Doug Seaton.  The Millages testified they found out three weeks later that she had moved, and it was a week after that before they were able to lo­cat­e her again.  Cara tes­tified she did con­tact the Millages after her move but admitted it was perhaps a month before she did so.  

There was testimony Cara did not make any seri­ous ef­fort for the return of Elizabeth in the first two years of Elizabeth's life.  Chrystal testified that Cara spoke of tak­ing Eliza­beth per­ma­nent­ly in the future but never asked for Elizabeth's per­ma­nent re­turn.  Cara sometimes spoke of giv­ing up custody to Chrystal.  Cara tes­ti­fied she tried to get Eliz­abeth back in February 1995--she told Chrystal she would be back to get her as soon as Cara's plumbing was re­done, and Chrystal said that would be fine, but the plumbing was not done when Chrystal's peti­tion to modify was filed.  Cara testi­fied she had taken Eliz­abeth to her home at times, and the Millages would always come get her and say something like they had a birthday party to take her to, and then not bring her back.  Cara never asked the Millages for an expla­nation of their failure to return Elizabeth.  Judith testi­fied she warned Cara the Millages would take Eliza­beth away from her if Cara didn't keep her more, but Cara said she couldn't because of Eric.  

Cara argues she had the physi­cal custody of Eliza­beth immediately before the Millages filed their peti­tion, but the Millages got Elizabeth back by a ruse.  On March 28, 1995, Cara and Eric signed papers agreeing to the entry of a judgment of dissolution.  At that time, ac­cord­ing to Cara, she told the Millages she wanted them to sur­ren­der Eliz­abeth to her, which they did.  Cara testi­fied she also picked up Heather in April 1995.  Cara had Eliza­beth for three days, until the Millages "showed up, and they wanted to take her for like to the park or some­thing, so I said okay."  The Millages never brought Elizabeth back and in­stead filed this action on May 31, 1995.  The three-day period she had Elizabeth in March 1995 was the longest period Cara, by herself, had cared for Eliz­a­beth.  Cara ad­mit­ted she did not take Elizabeth's clothes from the Millages on March 28.  Chrystal denied that Cara ever told her when she picked up Eliza­beth that she was taking her perma­nently.  Chrystal denied she ever tried to keep Eliza­beth away from Cara.  Chrystal filed the peti­tion to modify be­cause she heard Cara was going to move to Mis­souri and pick up Eliz­abeth and take her with her, and Chrystal did not want to lose her.      

On May 31, 1995, Chrystal Millage filed her peti­tion for custody.  The next day, Cara agreed to an order that Chrystal would have temporary custody, pending a hear­ing.  On June 15, 1995, after Cara had obtained coun­sel, the court contin­ued tem­po­rary cus­tody in Chrystal.  

On October 5, 1995, Cara married Doug Seaton.  On No­vem­ber 15, 1995, Cara gave birth to a daughter, Samantha, by Doug.  Doug is rough­ly $8,000 in debt in back child sup­port pay­ments for two children from a pre­vious relation­ship.  Doug told Holmgren he pled guilty to a charge of battery seven years ago.  Accord­ing to Holmgren's re­port, none of the ref­er­enc­es Doug and Cara gave to Holmgren were very famil­iar with Cara, and one actu­ally rec­om­mend­ed against giving Doug custo­dy of a three-year-old child.  On April 21, 1996, Cara returned Elizabeth from visita­tion with bruises.  Elizabeth hurt herself while Doug was baby-sitting her when she fell off a file cabinet.  Doug and Cara called Chrystal, who then took Elizabeth to the doctor.  The De­partment of Children and Fami­ly Services told Cara not to leave the chil­dren alone with Doug, but it did no followup after the initial report.  Ju­dith also tes­tified Eliza­beth had burns when she re­turned from a visit with the Millages.  Wil­liam tes­ti­fied she prob­a­bly got these burns by jump­ing on their son's mo­tor­cycle while he and the son were work­ing on it.

In the meantime, on October 11, 1995, the Woods had filed a petition to intervene, seeking that they be awarded the custody of Elizabeth.  Intervention was at first al­lowed, but the court later reversed itself.  On December 11, 1996, the guardian 
ad
 
litem
 filed a report recommending that custody be awarded the Millages, on the basis that stability of environment was more important here than the natural right of the mother.  The guard­ian 
ad
 
litem
 recommended that Cara be given liberal visitation.  On January 14, 1997, the circuit court awarded cus­tody of Eliza­beth to the Millages.  The court noted that when it had awarded custody to Cara in the dissolution proceed­ings Cara had stated under oath that she had custody of Eliza­beth.  The court found that Cara had voluntarily surrendered custody to Chrystal, that Chrystal had provided practically all of the day-to-day care of Elizabeth, and there was no credible proof of any hindrance to Cara's taking custody during the 2½ years after the birth of Eliz­abeth.  The court rec­ognized the strong presumption in favor of the natural parent but found the presumption had been over­come.  The court found that Cara had allowed a mother-child rela­tion­ship to arise between Chrystal and Elizabeth, that Cara had contribut­ed nothing to the financial support of Eliza­beth, that there were doubts as to Cara's mental stability in that she had allowed both her chil­dren to live with others most of their lives, that there was no reasonable explanation why Cara let this situation contin­ue, and that Cara failed to visit with her child on a regular basis and failed to maintain any signifi­cant degree of parental involvement for the first 2½ years of the child's life.  The court stated the primary reason for its ruling was the desire to maintain some continuity in the child's life.  The court re­fused to find Cara unfit and ordered that Cara have rea­sonable visitation.  

Sec­tion 601(b)(2) of the Act pro­vides a child cus­tody pro­ceed­ing is com­menced "by a person other than a parent, by filing a peti­tion for custo­dy of the child *** 
but only if he is not in the phys­ical custody of one of his par­ents
."  (Empha­sis added.)  750 ILCS 5/601(b)(2) (West 1994).  This lan­guage re­quires nonparents seek­ing cus­tody to dem­on­strate the child is not in the physi­cal cus­tody of one of his par­ents.  See 
In re Cus­to­dy of Pe­ter­son
, 112 Ill. 2d 48, 52-53, 491 N.E.2d 1150, 1152 (1986).
  The standing re­quire­ment applies to mo­tions to inter­vene as well as initial custody peti­tions.  
In re Mar­riage of Nicho­las
, 170 Ill. App. 3d 171, 176, 524 N.E.2d 728, 731 (1988); 
In re Parent­age of Unborn Child Brumfield
, 284 Ill. App. 3d 950, 954, 673 N.E.2d 461, 464 (1996).  

The determination that a parent does not have physical custody of a child turns not on possession; rather, it requires that that parent somehow has voluntarily and indefinitely relin­quished custody of the child.  
In re Petition of Kirchner
, 164 Ill. 2d 468, 491, 649 N.E.2d 324, 335 (1995).  Not every volun­tary turn­over of a child will deprive the parent of physical custody, however.  The court must consider factors such as (1) who was responsible for the care and welfare of the child prior to the initiation of custody proceedings; (2) the manner in which physi­cal possession of a child was acquired; and (3) the nature and duration of the pos­session.  
In re Marriage of Santa Cruz
, 172 Ill. App. 3d 775, 783, 527 N.E.2d 131, 136 (1988); 
In re Marriage of Brownfield
, 283 Ill. App. 3d 728, 735-36, 670 N.E.2d 1198, 1203-04 (1996); 
Kirchner
, 164 Ill. 2d at 493, 649 N.E.2d at 335-36.  

The trial court's determination that Cara voluntarily relinquished physical custody to the Millages is clearly cor­rect.  There can be no dispute that Cara's turnover of the child was vol­un­tary.  Furthermore, this was not a babysitting arrangement or otherwise limited arrangement.  The Millages very quick­ly be­came the persons responsible for the care and wel­fare of the child.  Cara argues that her original intent was that the Millages would have Elizabeth only for a few weeks, and she never changed that in­tent, although she kept putting off the time when she would re­sume responsibility for the child, citing 
Frank­lin v. Devriendt
, No. 1-95-4007 (June 10, 1997), ___ Ill. App. 3d ___, ___ N.E.2d ___, where a finding there was no standing was af­firmed.  
Frank­lin
 did note that the par­ties there intended the intervenors' care of the child, which ended up lasting a year and eight months, to be a tem­po­rary situ­a­tion.  In 
Frank­lin
, how­ev­er, the fa­ther cared for the child on a daily basis while the child lived with inter­venors (the father's mother and her husband), and pro­vid­ed fi­nan­cial support as well.  
Franklin
, No. 1-95-4007, slip op. at 6 (June 10, 1997), ___ Ill. App. 3d at ___, ___ N.E. 2d at ___.  The 
Franklin
 court also found that the trial court's deci­sion was not contrary to the manifest weight of the evidence, and we do the same here.  
Franklin
, No. 1-95-4007, slip op. at 11 (June 10, 1997), ___ Ill. App. 3d at ___, ___ N.E.2d at ___.  At some point, a se­ries of tem­po­rary jus­ti­fica­tions is no longer a credi­ble expla­na­tion, and a trier of fact can reason­ably con­clude that a parent no longer intends a living arrange­ment to be tempo­rary.  It is not nec­es­sary that the par­ent intend to per­ma­nently relin­quish custo­dy; an intent to indef­i­nitely relin­quish custody  is suffi­cient.  
Kirchner
, 164 Ill. 2d at 491, 649 N.E.2d at 335.

We are concerned with the argument that Cara had phys­ical custody before the Millages filed their petition and that the Millages obtained possession of Elizabeth by a ruse.  The ab­duc­tion of a minor in order to satisfy the literal terms of the standing requirement will not be tolerated.  
Pe­ter­son
, 112 Ill. 2d at 53-54, 491 N.E.2d at 1152-53.  In 
In re Custo­dy of Menconi
, 117 Ill. App. 3d 394, 453 N.E.2d 835 (1983), the court found stand­ing where a father left a child with his parents for almost six years, then forcibly removed the child from his parents' home four days before they filed a petition for custody.  In the pres­ent case, however, the trial court did not believe Cara when she testified the Millages had the child at the time of filing only by deceitfully telling Cara they want­ed to visit with the child.  The evidence fully supports the trial court's find­ing.  Chrystal testified Cara did not tell her she was taking the child back permanently on March 28, and Cara did not attempt to pick up the child's clothes at that time.  Cara tes­ti­fied she only had the child for three days, and she did not ex­plain why she did not attempt to get the child back from the Millages be­fore May 31, two months later, when they filed their peti­tion.  

Even if a nonparent is found to have standing and the case is decided under the best interest of the child standard, the court will still give considerable weight to the right of the natural parent.  
In re Custody of Townsend
, 86 Ill. 2d 502, 508, 427 N.E.2d 1231, 1234 (1981).  The wishes of the child's parent is the first factor listed under section 602(a) of the Act.  750 ILCS 5/602(a)(1) (West 1994).  A third party seek­ing to ob­tain or re­tain cus­to­dy of a child over the superior right of the natu­ral parent must demon­strate good cause or reason to over­come the presumption that a parent has a superi­or right to custo­dy 
and
 further must show that it is in the child's best interests that the third party be awarded the care, custody and control of the minor.  
Townsend
, 86 Ill. 2d at 510-11, 427 N.E.2d at 1235-36; 
Peo­ple ex rel. Ed­wards v. Livingston
, 42 Ill. 2d 201, 208-09, 247 N.E.2d 417, 421 (1969).  If the only reason for pre­ferring the Millages over Cara was the "desire to maintain some continu­ity in the child's life," we would question whether the presump­tion in favor of the natural parent had been overcome.  Sometimes chil­dren are reunit­ed with a parent after the parent has spent years in a hospital or years overseas, for example, on military duty.  
Townsend
 held that the de­sire for sta­bil­i­ty and con­ti­nu­ity, how­ever impor­tant it may be in a given case, does not rise to the level of a pre­sumption so as to neu­tralize the supe­rior right doctrine or transpose the supe­rior right from the natural parent to the third person.  
Townsend
, 86 Ill. 2d at 515, 427 N.E.2d at 1237-38.    

Although the trial court described continuity as the primary reason for its decision, the trial court re­ferred to other factors as well.  The court was con­cerned with Cara's atti­tude toward her responsibilities as a mother, noting that she had left both her children with others for most of their lives and that Cara had failed to main­tain any sig­nifi­cant de­gree of paren­tal in­volvement for the first 2½ years of Elizabeth's life.  There was testimony that Cara did not show much interest in Eliz­abeth even during visitation.  There was some evi­dence that Cara's hus­band was not a good per­son to have around young chil­dren.  There was tes­timony that Cara had made improve­ments in her life, that her housekeep­ing skills had im­proved, that her parenting skills have improved now that she is raising Heather, and that she is closer to her family now that Eric, whom her family did not like, is gone.  There was also tes­timo­ny, however, that the Millages' home is an appropri­ate place in which Eliza­beth could be raised.  There was testimo­ny that Cara got along well with Elizabeth, but there was also tes­timony the Millages got along well with Eliza­beth.  

We cannot say that the trial court's decision that the Millages had standing, or that it was in the best interests of the child to award custody to the Millages, was against the mani­fest weight of the evidence.  See 
In re Custody of McCuan
, 176 Ill. App. 3d 421, 427, 531 N.E.2d 102, 106 (1988); 
In re Marriage of Siklossy
, 87 Ill. App. 3d 124, 128, 409 N.E.2d 29, 32 (1980).  We affirm both the trial court's finding the Millages had stand­ing and the trial court's ultimate decision to award the Millages custody.

Affirmed. 
  

STEIGMANN, P.J., and McCULLOUGH, J., concur.