*In re* MARRIAGE OF JOHN CAREY, Petitioner, and CAROL CAREY, Respondent-Appellant (Mary Carey, Intervenor-Appellee).

Second District No. 2—88—0890

Opinion filed October 2, 1989.

DUNN, J., dissenting.

Botti, Marinaccio, DeSalvo & Tameling, Ltd., of Oak Brook (Eva W. Tameling, of counsel), for appellant.

Law Offices of William J. Stogsdill, Jr., P.C., of Wheaton (Andrew M. Carter, of counsel), for appellee.

JUSTICE LINDBERG delivered the opinion of the court:

Respondent, Carol Carey, the natural mother of the minor child, Brendan Carey, and the former spouse of Brendan's natural father, the deceased John Carey, appeals from the judgment of the circuit court of Du Page County finding in a modification of custody proceeding pursuant to section 610 of the Illinois Marriage and Dissolution of Marriage Act (the Dissolution Act) (Ill. Rev. Stat. 1987, ch. 40, par. 610) that it is in the best interests of Brendan to place permanent legal custody of Brendan with John Carey's second wife and widow, Brendan's stepmother, the intervenor, Mary Carey.

On August 1, 1964, John Carey (John) and Carol Carey (Carol) were married. Their marriage produced four children, Sean, Kathleen, Maureen and Brendan. In January 1980, Carol moved out of the marital residence in Wheaton, Illinois, and into an apartment, also located in Wheaton. The children lived with John in the marital residence. On September 14, 1981, the circuit court of Du Page County entered a judgment of dissolution of marriage which incorporated a settlement agreement entered between John and Carol. At the time of dissolution, Sean was 16 years old, Kathleen was 14, Maureen was 10 and Brendan was 6. The settlement agreement incorporated in the judgment of dissolution of marriage gave the care, custody and control of the children to John, with Carol having rights to reasonable visitation.

In the summer of 1980, John began dating Mary Carey (Mary). Mary spent considerable time with the children of John and Carol while dating John. In December 1981, Mary moved into John and the children's home, and John and Mary were married on January 15, 1982.

In 1984, John, who like Mary, worked for the Internal Revenue Service, was transferred to Washington, D.C. John petitioned the court to remove the children from Illinois to the Washington, D.C., area. On October 30, 1984, the circuit court of Du Page County entered an order by agreement of John and Carol which provided in

relevant part that John would retain "permanent custody" of the minor Brendan, age nine, and be allowed to move Brendan with him to the Washington, D.C., area. The agreed order also transferred the permanent custody of the minor Maureen, age 14, to Carol. The order set a liberal visitation schedule for John and Carol to see Maureen and Brendan. The two other children, Sean and Kathleen, had attained emancipation and were no longer the subject of custody arrangements between John and Carol.

John, his wife Mary, and Brendan moved to a suburb of Washington, D.C., located in Fairfax County, Virginia. A mother-son relationship developed between Brendan and his stepmother, Mary. Carol exercised her rights to visitation with her son Brendan, including 18 overnight visits in 1984. The situation remained this way until 1987.

In the early hours of Saturday, October 24, 1987, John Carey died. John did not leave a last will and testament. That afternoon Mary and Carol talked by phone. Carol, a teacher in the Chicago public school system, expressed her desire to come to Virginia that evening to get Brendan. Mary did not intend to allow Brendan to go with Carol. Carol did not go to Virginia that Saturday.

Within a few days of John's death, Mary commenced proceedings in a circuit court for the county of Fairfax, Virginia, to obtain an order appointing Mary and Brendan's paternal grandmother, Ann Carey, guardians of Brendan. Mary's "Petition for Appointment of a Guardian" stated that Brendan, age 12, who had an estate of $500, had resided with his father, John, and his stepmother nearly six years, and in Fairfax County, Virginia, since 1984 and that John had died. The petition further stated that Carol Carey, a resident of Illinois, by an agreed order entered in the circuit court of Du Page County, Illinois, relinquished full legal custody of Brendan to John. The petition further stated that Brendan, the heir of his father's estate, wished to continue to reside with Mary in Virginia. The notarized petition was signed by Mary and Ann Carey. On November 13, 1987, the circuit court of Fairfax County, Virginia, finding Brendan without a guardian and in need of a guardian, entered an order appointing Mary and Ann Carey temporary guardians of Brendan and his estate. Carol was not given notice of these proceedings.

On November 8, 1987, in the circuit court of Du Page County, Carol petitioned for an emergency modification of custody pursuant to section 610 of the Dissolution Act (Ill. Rev. Stat. 1987, ch. 40, par. 610). Mary was given notice of these proceedings and filed responsive pleadings. After the filing by Mary and Carol of various pleadings on January 6, 1988, Mary's petition *forum non conveniens* was

denied, the circuit court of Du Page County finding it had jurisdiction to make a custody determination under the Dissolution Act and the Uniform Child Custody Jurisdiction Act (the Child Custody Act) incorporated into the Dissolution Act. (See Ill. Rev. Stat. 1987, ch. 40, pars. 601(a), 2104.) The trial court gave leave to Mary to file her petition to intervene and other responsive pleadings. The January 6, 1988, order also provided for Mary, as coguardian, to maintain physical possession of Brendan pending a hearing on temporary custody which was set for February 5, 1988. Carol petitioned for and was granted reasonable visitation with Brendan in Virginia.

Mary filed a petition to intervene and also sought leave to file a counterpetition for permanent custody of Brendan. Carol filed pleadings seeking to dismiss Mary and strike her petition to intervene based upon Mary's lack of standing under section 601 of the Dissolution Act. (Ill. Rev. Stat. 1987, ch. 40, par. 601.) On February 5, 1988, the court, having communicated with the court in Virginia, reiterated the fact it had jurisdiction under the Dissolution Act and the Child Custody Act and also refused to strike Mary's petition based on a lack of standing. The trial court, based upon Mary's intention of seeking custody of Brendan, treated Mary's petition to intervene as a petition for custody to which the standing requirements of section 601(b)(2) of the Dissolution Act applied (Ill. Rev. Stat. 1987, ch. 40, par. 601(b)(2)). The trial court also stated that Mary would bear the burden of showing the best interests of Brendan were to remain with her in Virginia. The trial court gave leave to Mary to file her counterpetition for custody and ordered Carol to respond. The order did not address temporary custody, but Brendan remained with Mary subject to Carol's rights of visitation.

Discovery schedules were set and eventually a trial date was set for July 27, 1988, on the issue of Brendan's best interests under section 602 of the Dissolution Act (Ill. Rev. Stat. 1987, ch. 40, par. 602). The burden to proceed was placed without objection upon Carol, apparently because she filed her petition for custody first. Shortly before trial, Carol filed a motion seeking an evidentiary hearing and reconsideration of whether Mary had standing to seek permanent custody under section 601 of the Dissolution Act (Ill. Rev. Stat. 1987, ch. 40, par. 601). On July 27, 1987, the day of trial, Judge Hayton, who was not the judge who originally found on February 5, 1988, that Mary had standing to seek custody, refused to reconsider the trial court's prior finding and denied Carol's motion.

At trial, Mary, Carol, their respective experts and a court-appointed psychologist testified. The trial court held an *in camera* in-

terview of Brendan in which the trial court asked Brendan its own questions and in which various questions, submitted by both sides' counsel and approved by the court, were asked. Neither party's counsel was allowed to be present although both were given transcripts of the interview. At the close of the evidence, the trial court found that it was in the best interests of Brendan to place permanent custody with Mary subject to Carol's liberal rights of visitation.

Initially, we must address the confusing and inadequate nature of Carol's appellate brief. She has failed to comply with numerous requirements of Supreme Court Rule 341(e) (107 Ill. 2d R. 341(e)) governing the contents and substance of an appellant's brief. Her statement of facts is replete with improper argument and characterizations of the record and is barely sufficient for an understanding of the issues raised on appeal. Additionally, the argument section of her appellant's brief contains no citation to the record whatsoever in support of the numerous facts and questionable characterizations contained in her legal arguments. Further, her brief makes numerous statements of law with no supporting authority.

■ Rather than dismiss the appeal for failure to substantially comply with Supreme Court Rule 341(e), we will address the single issue for which Carol has cited legal authority and for which the facts necessary to understand the issue are simple and, for the most part, sufficiently stated in the statement of facts. (See *Mead v. Board of Review* (1986), 143 Ill. App. 3d 1088, 494 N.E.2d 171.) The other issues sought to be argued by Carol on appeal are waived for failure to comply with Supreme Court Rule 341(e)(7), concerning citation to the record and authority in support of the arguments contained in the appellate brief. *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 453 N.E.2d 1133 (a court of review is entitled to have the issues clearly defined and to be cited pertinent authority).

The only issue sufficiently raised and argued on appeal is whether the nonparent, Mary, had standing under section 601(b)(2) of the Dissolution Act to seek custody of Brendan under the best interests standard of the Dissolution Act. (See Ill. Rev. Stat. 1987, ch. 40, pars. 601(b)(2), 602.) Furthermore, we note that Carol does not argue on appeal that the trial court's finding that the best interests of Brendan dictate custody be placed with Mary was an abuse of discretion or against the manifest weight of the evidence. *In re Custody of Piccirilli* (1980), 88 Ill. App. 3d 621, 626, 410 N.E.2d 1086, 1090.

Carol contends the trial court erred in finding that Mary had standing under section 601(b)(2) of the Dissolution Act to seek custody of Brendan under the best interests standard of the Dissolution

Act (Ill. Rev. Stat. 1987, ch. 40, par. 601) in light of Carol's superior right as a natural mother to custody of Brendan. Intervenor, Mary, argues that the trial court properly found that she had standing either under sections 601(b)(2) or 601(c) of the Dissolution Act (Ill. Rev. Stat. 1987, ch. 40, pars. 601(b)(2), (c)) or under section 4 of the Child Custody Act (Ill. Rev. Stat. 1987, ch. 40, par. 2104).

■■ We agree with Carol that, in order to seek custody of a child under the modification of custody procedures of the Dissolution Act, a nonparent seeking custody must meet the standing requirements of section 601(b)(2). (*In re Marriage of Nicholas* (1988), 170 Ill. App. 3d 171, 524 N.E.2d 728.) Further, we do not find any standing requirement relating to a nonparent's right to seek custody under the Child Custody Act as incorporated under the jurisdictional section of the Dissolution Act (Ill. Rev. Stat. 1987, ch. 40, par. 601(a)) that would lead us to conclude that the standing requirements of section 601(b)(2) were intended by the legislature to be inapplicable to a nonparent seeking custody just because such nonparent happens to reside outside Illinois. See *In re Custody of Barokas* (1982), 109 Ill. App. 3d 536, 541, 440 N.E.2d 1036, 1040.

■■ ■ The superior rights of a natural parent to the care, custody and control of his or her child are well recognized in Illinois and embodied in our statutory law. (*In re Custody of Peterson* (1986), 112 Ill. 2d 48, 51, 491 N.E.2d 1150, 1152.) Under the Juvenile Court Act (Ill. Rev. Stat. 1987, ch. 37, par. 801—1 *et seq.*) and the Adoption Act (Ill. Rev. Stat. 1987, ch. 40, par. 1501 *et seq.*), unless a natural parent consents or is judged "unfit," a child may not be placed in the custody of a nonparent. (*In re Custody of Peterson* (1986), 112 Ill. 2d 48, 491 N.E.2d 1150.) However, under the Dissolution Act, a nonparent may obtain custody of a child if the best interests of the child so dictate without a showing that the natural parent is unfit. Ill. Rev. Stat. 1987, ch. 40, par. 101 *et seq.*; *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 491 N.E.2d 1150.

■ Before a nonparent may proceed under the best interests standard of the Dissolution Act (see Ill. Rev. Stat. 1987, ch. 40, par. 602), the nonparent seeking custody must first show that he or she meets the standing requirements of section 601(b)(2) of the Dissolution Act. (Ill. Rev. Stat. 1987, ch. 40, par. 601(b)(2); *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 491 N.E.2d 1150; *In re Marriage of Nicholas* (1988), 170 Ill. App. 3d 171, 524 N.E.2d 728 (nonparent seeking to intervene in proceedings pursuant to section 601(c) of the Dissolution Act must meet section 601(b)(2) standing requirement where intervenor nonparent seeks custody); see *In re Person & Es-*

*tate of Newsome* (1988), 173 Ill. App. 3d 376, 527 N.E.2d 524 (applied section 601(b)(2) standing requirement in probate proceedings to maternal grandparents who sought custody of child who had lived with and was in physical possession of man who lived with mother at time of mother's death and claimed to be father).) The superior right of a natural parent to legal custody of his or her child is recognized and protected in the Dissolution Act by requiring a nonparent seeking custody to first meet the standing requirements of section 601(b)(2) of the Dissolution Act (Ill. Rev. Stat. 1987, ch. 40, par. 601(b)(2)), before being considered for custody under the best interests standard without the necessity of first establishing the unfitness of the parent. (*In re Custody of Peterson* (1986), 112 Ill. 2d 48, 53, 491 N.E.2d 1150, 1152; *In re Marriage of Nicholas* (1988), 170 Ill. App. 3d 171, 175, 524 N.E.2d 728, 731; *In re Custody of Barokas* (1982), 109 Ill. App. 3d 536, 541, 440 N.E.2d 1036, 1040.) The superior right of a natural parent to custody of his or her child is not absolute but only one of several factors looked to in determining best interests of the child. *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 51-52, 491 N.E.2d 1150, 1151.

■ Section 601(b)(2) of the Dissolution Act provides in relevant part:

"A child custody proceeding is commenced in the court

* * *

(2) by a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, *but only if he is not in the physical custody of one of his parents.*" (Emphasis added.) Ill. Rev. Stat. 1987, ch. 40, par. 601(b)(2).

A determination of when a child is "not in the physical custody of one of his parents" so as to create standing in a nonparent seeking custody under the Dissolution Act is not subject to any clear litmus test or dependent upon any single fact such as who is in actual physical possession of the child at the time the petition for custody modification is filed. (See *In re Marriage of Santa Cruz* (1988), 172 Ill. App. 3d 775, 527 N.E.2d 131.) In *Santa Cruz*, this court extensively reviewed the only Illinois Supreme Court decision, *Peterson*, to have addressed the standing issue as well as *In re Custody of Barokas* (1982), 109 Ill. App. 3d 536, 440 N.E.2d 1036, and *In re Custody of Menconi* (1983), 117 Ill. App. 3d 394, 453 N.E.2d 835, which were the two cases favorably cited and relied upon by the court in *Peterson*. Additionally, in *Santa Cruz*, we discussed the facts of the three other recent decisions that have applied the rationale of *Peterson*.

(See *Montgomery v. Roudez* (1987), 156 Ill. App. 3d 262, 509 N.E.2d 499; *In re Custody of McCarthy* (1987), 157 Ill. App. 3d 377, 510 N.E.2d 555; *In re Custody of O'Rourke* (1987), 160 Ill. App. 3d 584, 514 N.E.2d 6.) From these cases, we concluded that a determination of whether a child was "not in the physical custody" of one of his parents under the language of section 601(b)(2) so as to confer standing on a nonparent to seek custody depended upon a consideration of various factors, including who was in physical possession of the child, how that person got possession as well as the duration and nature of the physical possession. *In re Marriage of Santa Cruz* (1988), 172 Ill. App. 3d 775, 783, 527 N.E.2d 131, 136.

██ Although relevant factors for a determination of standing include the manner, nature and duration of physical possession, such factors must be applied within the statutory scheme of the Dissolution Act and the Child Custody Act incorporated therein, which evince twin policies favoring the superior rights of parents to the custody of their children and the fostering of greater stability in the home environment by deterring abductions and other unilateral removals of children. (See *In re Custody of Menconi* (1983), 117 Ill. App. 3d 394, 398, 453 N.E.2d 835, 838; Ill. Rev. Stat. 1987, ch. 40, pars. 601, 2102(a)(4), (a)(5).) As the Illinois Supreme Court stated in *Peterson*, "the standing requirement under section 601(b)(2) should not turn on who is in physical possession, so to speak, of the child at the moment of filing the petition for custody. To hold differently would be to encourage abductions of minors in order to satisfy the literal terms of the standing requirement and would, in reality, defeat the statutory intendment." *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 53-54, 491 N.E.2d 1150, 1152-53.

Similar to our holding in *Santa Cruz* is the holding of the Appellate Court, Third District, in *In re Marriage of Nicholas* (1988), 170 Ill. App. 3d 171, 178, 524 N.E.2d 728, 733, which, after reviewing *Peterson, Barokas* and *Menconi*, stated "physical custody, as defined by section 601(b)(2), requires a determination of who was providing for the care, custody and welfare of the child prior to the initiation of custody proceedings." (*In re Marriage of Nicholas* (1988), 170 Ill. App. 3d 171, 178, 524 N.E.2d 728, 733.) Since no one factor is controlling in the determination of whether a child is not in the physical custody of one of his parents under section 601(b)(2), such a determination in a given case will depend heavily on the particular facts of the individual case.

It has been held that the overnight visit by a child to a third party and that party's refusal to return the child to its custodial par-

ent did not deprive that parent of "physical custody" as that term is used in section 601(b)(2) so as to create standing of the nonparent, third party, to seek custody of the child under the Dissolution Act. (*In re Custody of McCuan* (1988), 176 Ill. App. 3d 421, 531 N.E.2d 102.) The forcible removal of a child from his grandparents by a parent who had not cared for the child in the 6½ years since he left the child at age two months with the grandparents did not deprive the grandparents of standing under section 601(b)(2) to seek custody under the best interest standard of the Dissolution Act. (*In re Custody of Menconi* (1983), 117 Ill. App. 3d 394, 453 N.E.2d 835.) In some cases, the courts relied on the facts surrounding the voluntary relinquishment of the physical and/or legal custody of the child as well as the parents' intentions and expectations when relinquishing the child to the care of another. See *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 491 N.E.2d 1150; *Montgomery v. Roudez* (1987), 156 Ill. App. 3d 262, 509 N.E.2d 499 (mother upon voluntarily relinquishing custody of newborn to great aunt signed papers equivalent to adoption consent forms); *In re Marriage of Santa Cruz* (1988), 172 Ill. App. 3d 775, 527 N.E.2d 131; *In re Marriage of Gustafson* (1989), 181 Ill. App. 3d 472, 536 N.E.2d 1359.

██ In the instant case Carol, by the settlement agreement incorporated into the judgment of dissolution, gave permanent legal custody of Brendan, then age four, to John in 1981. Between 1982, after John's marriage to Mary, and 1984, prior to John, Mary and Brendan's move to Virginia, Brendan lived with John and Mary. Although Carol exercised visitation rights, Mary, as John's wife, undertook with John to provide for the care and welfare of Brendan. In 1984, Carol by an agreed order allowed John to retain permanent custody of Brendan and to move Brendan to Virginia, where Brendan's care, custody and welfare were provided by John and Mary. In 1987, when John died, a mother-son relationship existed between Mary and Brendan. Carol, although exercising her visitation rights, had not provided for the care, custody and welfare of Brendan in such a manner that, when John died, the trial court was required to find that physical custody as used in section 601(b)(2) was in Carol, who had voluntarily relinquished permanent legal custody in 1981. See *In re Custody of Menconi* (1983), 117 Ill. App. 3d 394, 453 N.E.2d 835 (where father voluntarily placed two-month-old daughter with his parents and in the next 6½ years the grandparents provided for the care and custody of the child and a mother-daughter relationship developed between the grandmother and child, the father's taking of the child from the grandparents four days prior to the grandparents' petition

for custody did not defeat the grandparents' standing under section 601(b)(2)); *cf. In re Custody of Peterson* (1986), 112 Ill. 2d 48, 491 N.E.2d 1150 (father, who lived on same block as ex-spouse granted custody of child, and who exercised regular visitation, had physical custody of child upon ex-spouse's death for purposes of defeating maternal grandparents' standing under section 601(b)(2) even though ex-spouse lived with child's maternal grandparents and they helped with the child, where the ex-spouse never gave custody of child to grandparents); *In re Marriage of Gustafson* (1989), 181 Ill. App. 3d 472, 536 N.E.2d 1359.

The dissent filed in this case takes the position that because the facts in this case so closely parallel those in *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 491 N.E.2d 1150, *Peterson* requires us to find that Mary had no standing to seek custody of Brendan because it would not have occurred to Carol that Mary had physical custody of Brendan and was developing a position of standing.

We disagree. In *Peterson* the custody arrangement was determined by the court rather than by agreement of the parties; here, Carol had previously agreed to Brendan's permanent custody with John at a time when John was dating Mary. After John and Mary were married, Carol agreed to allow Brendan to move with John and Mary to Washington, D.C., where they continued to reside until John's death some five years later. During this time, Mary, as John's wife, was an integral part of the family unit in which Brendan lived. It is apparent from the evidence that for five years, Brendan enjoyed a mother/son relationship. Although the grandparents in *Peterson* provided a home and helped their ailing daughter care for the child, there was no indication that the grandparents had established any parental relationship with the child.

Moreover, the facts in *Peterson* indicate that the custodial mother was residing with her parents because of her health. Although the mother and child did remain there until the mother's death, it appears that the arrangement was not initially intended to be a permanent one. In the case before us, however, the parties in agreeing to Brendan's residence out of State with his father and stepmother established a permanent arrangement which would no doubt have continued but for John's death. Given the distinguishing facts in this case, *Peterson* does not require us to find that Mary had no standing to seek custody of Brendan.

■ In the instant case, we do not find that the trial court's implicit finding that Brendan was not in the physical custody of one of his parents to be against the manifest weight of the evidence or that

the trial court erred in ruling that Mary had standing to petition for custody of Brendan under the best-interests standard provided for in modification of custody proceedings under the Dissolution Act. *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 491 N.E.2d 1150.

As Carol's brief repeatedly emphasizes, we are aware that the record indicated Mary took affirmative steps, such as staying with friends immediately after John's death, to prevent Carol from attempting to take possession of Brendan after John's death. Additionally, Mary may have possibly failed to fully inform the Virginia court during the guardianship proceedings of Carol's desire to obtain possession and control of Brendan, not to mention the fact that Carol retained liberal rights of visitation under the Illinois circuit court's order entered in 1984. However, Carol did not have the right to unilaterally retake physical custody of Brendan since the legal custody of Brendan upon John's death did not automatically revert to Carol. *In re Marriage of Nicholas* (1988), 170 Ill. App. 3d 171, 178, 524 N.E.2d 728, 733; *Milenkovic v. Milenkovic* (1981), 93 Ill. App. 3d 204, 416 N.E.2d 1140 (death of the custodial parent after a final judgment of dissolution of marriage has been entered does not automatically revert custody to the surviving noncustodial parent, but the court has jurisdiction to determine further custody transfers in that the legal custody of the child after the custodial parent's death is not immediately in anyone).

The proper procedure, as followed by Carol, was to petition the court for a modification of custody pursuant to section 610 of the Dissolution Act (Ill. Rev. Stat. 1987, ch. 40, par. 610). In this way, the twin policies of the Dissolution Act and the Child Custody Act, of avoiding child abductions and other unilateral removals of children and of fostering a stable home environment, were achieved to a great extent in that Brendan remained with Mary, with whom he had lived for the past six years, until the courts became involved and exercised their power to address the best interests of Brendan. (See *In re Custody of Menconi* (1983), 117 Ill. App. 3d 394, 398, 453 N.E.2d 835, 838.) We do not condone or excuse the actions of Mary which denied Carol her rights to visitation with Brendan after John's death. Nor, do we condone Carol's threat to remove Brendan from the household literally within days after the death of his father. However, the same rationale which controls the determination of standing under section 601(b)(2) dictates that Mary's actions would not result in her loss of standing under section 601(b)(2) where Mary as a nonparent otherwise properly had standing to seek custody under section 601(b)(2). *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 491 N.E.2d

1150 (physical custody and related issue of standing do not turn on who is in actual physical possession at time proceedings are commenced).

The judgment of the circuit court is affirmed.

Affirmed.

WOODWARD, J., concurs.

JUSTICE DUNN, dissenting:

I respectfully dissent because the holding of the majority cannot be reconciled with our supreme court's decision in *In re Custody of Peterson* (1986), 112 Ill. 2d 48, 491 N.E.2d 1150.

The majority recognizes that Mary only had standing to petition for custody of Brendan under the Act if he was "not in the physical custody of one of his parents" (Ill. Rev. Stat. 1987, ch. 40, par. 601(b)(2)). In *Peterson*, the child resided with her mother and maternal grandparents following the dissolution of her parents' marriage. The father, who lived on the same block, regularly exercised his visitation rights. After the mother's death, the grandparents petitioned for custody under the Act. Our supreme court noted that the grandparents had assisted in caring for the child but went on to state as follows:

> "Considering, however, that the mother continued to live with the child, it would not reasonably occur to the father that the maternal grandparents had physical custody of his child and were developing a position of standing, so that upon the death of his wife he could be deprived of his right to custody of his child. The father regularly exercised his visitation rights with Lynette at the Jadrychs, where Lynette and her mother lived. *Within the meaning of section 601(b)(2) Lynette must be considered to have been, upon her mother's death, in the physical custody of her father.*" (Emphasis added.) *Peterson*, 112 Ill. 2d at 54, 491 N.E.2d at 1153.

As Justice Green observed in his special concurrence in *In re Marriage of Gustafson* (1989), 181 Ill. App. 3d 472, *Peterson* provides that if the noncustodial parent continually shows interest in a child and seeks custody upon the death of the custodial parent, a constructive physical custody will be implied in favor of the noncustodial parent. (*Gustafson*, 181 Ill. App. 3d at 481, 536 N.E.2d at 1364 (Green, J., specially concurring).) This serves to protect the right of natural parents as against third parties to the care, custody,

and control of their children (181 Ill. App. 3d at 481, 536 N.E.2d at 1364 (Green, J., specially concurring)), a right that was mentioned in *Peterson* (112 Ill. 2d at 51, 491 N.E.2d at 1151). Here, as in *Peterson*, the noncustodial parent continually showed an interest in the child by regularly exercising visitation rights. The noncustodial parent also sought custody in both instances and immediately challenged custody petitions filed by third parties who had resided with the child and the custodial parent.

The only major factual difference between this case and *Peterson* is that the noncustodial parent contested custody of the child during the dissolution proceedings in *Peterson* while Carol Carey agreed in the case at bar that her husband, John, would receive custody of Brendan. Such an agreement, however, is not tantamount to an abandonment of a child or a loss of interest in him. A holding to the contrary would only serve to discourage amicable settlement of custody matters in dissolution proceedings by forcing the parties to litigate custody matters in order to fully protect their parental rights in the event of the other parent's death.

In the case at bar as in *Peterson*, the noncustodial parent regularly exercised visitation rights and maintained an interest in the child. It would not have occurred to Carol that the presence of Mary in John's household could cause Mary to attain standing to seek custody of Brendan in the event of John's death, just as it would not have occurred to the father in *Peterson* that the presence of the mother in the grandparents' household would give the grandparents standing to seek custody upon the mother's death (112 Ill. 2d at 54, 491 N.E.2d at 1153). Under *Peterson* and section 601(b)(2) of the Act, Mary lacked standing to seek custody of Brendan pursuant to the Act because Carol had physical custody of Brendan upon John's death.

In addition to protecting the rights of noncustodial parents, the *Peterson* holding also serves the interests of children. This is somewhat ironic because the standard for custody determinations under the Act is the best interests of the child, and *Peterson* takes a restrictive view of standing under the Act. By doing so, however, our supreme court has discouraged custody litigation upon the death of custodial parents, thus preventing many children who have undergone the trauma of a parent's death from then undergoing the trauma of being the subject of a custody battle. In cases where the noncustodial parent is an unfit custodian, custody may still be challenged under the Adoption Act (Ill. Rev. Stat. 1987, ch. 40, par. 1501 *et seq.*) as our supreme court noted in *Peterson* (112 Ill. 2d at 55, 491

N.E.2d at 1153). Since I believe that *Peterson* compels the conclusion that Mary did not have standing under section 601(b)(2) of the Act to seek custody of Brendan, I respectfully dissent.