NO. 4-95-0964

                         IN THE APPELLATE COURT 

                                    

                               OF ILLINOIS

                                    

                             FOURTH DISTRICT

                                    

In Re:  the Marriage of             )  Appeal from 

MARC A. BROWNFIELD,                 )  Circuit Court of

          Petitioner,               )  Champaign County

          and                       )  No. 89C575

JOAN M. MADRIGAL, f/k/a JOAN N.     )

BROWNFIELD,                         )

          Respondent-Appellant,     )

          and                       )  Honorable

CYNTHIA A. BROWNFIELD,              )  Harry E. Clem,

          Intervenor-Appellee.      )  Judge Presiding.

________________________________________________________________

          JUSTICE GARMAN delivered the opinion of the court:

          In January 1995, intervenor Cynthia Brownfield (Cindy),

stepmother of two minor children, Shane and Tanya Brownfield

(born April 10, 1985 and October 20, 1987, respectively) brought

a petition for custody in the underlying dissolution action after

the children's father, Marc Brownfield, died.  The circuit court

found Cindy had standing to seek custody and awarded custody of

both children to Cindy.

          The children's natural mother, Joan Madrigal (f/k/a

Joan Brownfield), appeals arguing the court erred in holding

Cindy had standing to seek custody of the children under section

601(b)(2) of the Illinois Marriage and Dissolution of Marriage

Act (Act) (750 ILCS 5/601(b)(2) (West 1994)).  We conclude that

the children were not in Joan's physical custody when Cindy filed

her petition for custody and, therefore, affirm the circuit

court's judgment that Cindy had standing to seek custody under

the Act.

          Petitioner Marc Brownfield and Joan were married on No-

vember 29, 1981.  Two children were born to the parties:  a son,

Shane, and a daughter, Tanya.  The parties separated in April

1988 and, on May 19, 1989, the court entered a judgment of disso-

lution of marriage.  The judgment incorporated the marital set-

tlement agreement of the parties which provided that Marc would

receive custody of Shane and Joan would receive custody of Tanya,

subject to liberal visitation by each party with the child not in

his or her custody.  

          In September 1989, Joan asked Marc to take custody of

Tanya because Joan was experiencing physical difficulties and be-

lieved it would be in Tanya's best interest to live with her

father and brother.  Thus, on September 28, 1989, pursuant to a

stipulation by the parties, the court entered an order modifying

the judgment order of dissolution, and awarding Marc the perma-

nent care, custody and control of both children, subject to lib-

eral rights of visitation with Joan.  The court also ordered Joan

to pay Marc $200 per month per child as child support, beginning

in September 1989.  

          Intervenor Cindy and her daughter Emily moved into

Marc's home in June 1990.  Marc and Cindy were married on April

1, 1991.  Marc, Cindy, Emily, Shane, and Tanya resided together

as a family from June 1990 until Marc's death from cancer on

January 10, 1995.

          On January 10, 1995, Cindy filed a petition to inter-

vene in the parties' dissolution action and a petition for tempo-

rary and permanent custody of Shane and Tanya.  That day, the

court entered an order indicating Cindy's petition to intervene

should be allowed and awarding her temporary emergency custody of

the children.  Joan filed her answer to Cindy's petition on Feb-

ruary 2, 1995, in which she requested permanent custody of the

children.  Joan raised no affirmative defenses to Cindy's peti-

tion for custody in her answer.   

          On March 1, 1995, a hearing on temporary custody was

held, at the conclusion of which the court awarded Cindy tempo-

rary custody of the children and set the hearing on permanent

custody for August 23, 1995.  Then, on July 17, 1995, Joan filed

a motion to dismiss Cindy's petition, asserting for the first

time Cindy lacked standing to seek custody of the children under

section 601(b)(2) of the Act.  A hearing on the motion to dismiss

was held on August 4, 1995, and, on August 17, 1995, the court

denied the motion because it found the standing issue involved

disputed issues of material fact which could not be resolved in a

summary manner.  

          A full evidentiary hearing took place on August 23 and

24, 1995, on the issues of standing and permanent custody.  On

September 7, 1995, the court entered its order, finding the evi-

dence established that Cindy had standing to seek custody of the

children and that, based on the evidence presented as to the

children's best interests, the presumption in favor of Joan as

custodial parent under the superior rights doctrine had been

overcome.  Thus, the court awarded the permanent care, custody

and control of the children to Cindy, subject to Joan's visita-

tion rights which are detailed in the order.  

          Joan filed a motion to reconsider on September 20,

1995, asserting the court erred (1) in its determination of the

standing issue, (2) in its best interests determination, and (3)

in its determination the presumption in favor of Joan as to cus-

tody of the children had been overcome.  The court denied the

motion to reconsider on November 9, 1995, and this appeal fol-

lowed.  

          As a threshold issue, Cindy argues Joan waived the

issue of standing by not raising it either in a motion to dis-

miss, filed before her answer, or in her answer.  Joan filed her

answer in February 1995 and a temporary custody hearing was held

in March 1995, yet she did not raise the affirmative defense of

standing until she filed her motion to dismiss in July 1995. 

          Lack of standing is an affirmative defense to be raised

within the time for pleading.  735 ILCS 5/2-619(a)(9) (West

1994).  However, the trial court has discretion to allow parties

to file late pleadings and may do so unless it can be demonstrat-

ed the opposing party would be prejudiced by the late filing.  

In re Custody of McCarthy, 157 Ill. App. 3d 377, 380-81, 510

N.E.2d 555, 557 (1987).  

          The record does not strongly suggest Cindy was prej-

udiced by the late presentation of the standing issue.  The scope

of inquiry is very broad at a best interests hearing and the

facts brought out at such a hearing are frequently also relevant

to the determination of standing.  Because the court ruled on the

motion to dismiss only after a full evidentiary hearing, at which

Cindy was able to present substantial evidence on the standing

issue, we conclude the court did not abuse its discretion in

allowing Joan to raise the affirmative defense in her motion to

dismiss filed July 17, 1995. 

          We next address the substance of Joan's contention that

the circuit court erred in finding Cindy had standing to seek

custody of the children under the Act.  Section 601(b)(2) of the

Act sets forth:

               (b) A child custody proceeding is com-

          menced in the court:

                                   * * *

                    (2) by a person other than a

               parent, by filing a petition for

               custody of the child in the county

               in which he is permanently resident

               or found, but only if he is not in

               the physical custody of one of his

               parents."  (Emphasis added.)  750

               ILCS 5/601(b)(2) (West 1994).

The superior right of a natural parent to custody of his or her

child is recognized and protected in the Act by requiring a non-

parent seeking custody to meet the standing requirement embodied

in section 601(b)(2) of the Act before being considered for cus-

tody under the best interests standard set forth in section 602

of the Act (750 ILCS 5/602 (West 1994)).  In re Petition of

Kirchner, 164 Ill. 2d 468, 491, 649 N.E.2d 324, 335 (1995).  To

establish standing, a nonparent must show a child is "not in the

physical custody of one of his parents" before she can seek cus-

tody of the child.  750 ILCS 5/601(b)(2) (West 1994); see also

Kirchner, 164 Ill. 2d at 491, 649 N.E.2d at 335; In re Custody of

Barokas, 109 Ill. App. 3d 536, 541, 440 N.E.2d 1036, 1040 (1982).

           Courts have consistently rejected the argument that

physical possession equals physical custody; the term physical

custody encompasses the legal right to the care, physical posses-

sion, and control of a child.  Kirchner, 164 Ill. 2d at 491, 649

N.E.2d at 335; see also In re Custody of Peterson, 112 Ill. 2d

48, 53-54, 491 N.E.2d 1150, 1152-53 (1986).  

          Joan presents two arguments in support of her position

that Cindy lacks standing under section 601(b)(2) of the Act. 

First, she asserts that under Peterson and its progeny, upon the

death of Marc, she was vested with constructive physical custody

of the children.  See In re Marriage of Gustafson, 181 Ill. App.

3d 472, 536 N.E.2d 1359 (1989).  Joan's second argument is that

in determining whether she voluntarily relinquished custody of

the children, the court should look at her actions after the

death of Marc, not before.    

          In the dissolution action in Peterson, both parents

sought custody of the child and both were found fit to have cus-

tody, yet the trial court awarded the mother custody, subject to

the father's liberal rights of visitation.  Peterson, 112 Ill. 2d

at 51, 491 N.E.2d at 1151.  The child and her mother lived with

the mother's parents, who assisted the mother in caring for the

child, due to the mother's illness.  The father lived on the same

block as the child and mother and regularly exercised his visita-

tion rights.  When the mother eventually died of her illness, the

grandparents would not release the child to her father, and he

petitioned for custody under the Act.  

          The grandparents asserted a claim to custody, which the

father immediately contested, arguing that under section

601(b)(2) of the Act, the grandparents did not have standing to

seek custody of his child.  The supreme court agreed, holding

that the grandparents did not have standing merely because they

were in physical possession of the child when the petition for

custody was filed.  The court reasoned that as the mother had

been in constant physical custody of the child and the father had

reasonably exercised his rights of visitation, the father gained

physical custody upon the mother's death, thus barring the grand-

parents from having standing to seek custody.  Peterson, 112 Ill.

2d at 54, 491 N.E.2d at 1153.

          Although under Illinois law, a noncustodial parent is

not automatically vested with custody upon the death of the cus-

todial parent (Milenkovic v. Milenkovic, 93 Ill. App. 3d 204,

212, 416 N.E.2d 1140, 1145 (1981); McCarthy, 157 Ill. App. 3d at

383, 510 N.E.2d at 558; see also Mackie v. Mackie, 88 Ill. App.

2d 61, 67, 232 N.E.2d 184, 188 (1967)), Peterson established that

when the noncustodial parent has not been found unfit, and has

regularly exercised visitation and demonstrated interest in the

child, it is proper that he be vested with custody upon the death

of the custodial parent.  Peterson, 112 Ill. 2d at 54, 491 N.E.2d

at 1153.

          In Gustafson, relied upon by Joan, this court noted

that immediately following the death of the custodial parent,

legal custody of a child is not in anyone, since the death of a

custodial parent does not automatically revert custody to the

surviving parent.  Gustafson, 181 Ill. App. 3d at 477, 536 N.E.2d

at 1361-62.  The Gustafson court commented on the trial court's

role in modifying custody orders, stating "[w]e note the validity

of the trial court's suggestion when it emphasized the importance

of the dissolution court's sole jurisdiction to change physical

custody."  Gustafson, 181 Ill. App. 3d at 479, 536 N.E.2d at

1362.  However, consistent with Peterson, the court held that a

parent determined fit, who had maintained reasonable visitation

and interest in his child, should not be required to litigate the

issue of custody at a best interests hearing and, therefore, was

vested with custody following the custodial parent's abandonment

of the children.  Gustafson, 181 Ill. App. 3d at 479, 536 N.E.2d

at 1363.  

          The present case is distinguishable from Peterson and

Gustafson in several respects.  First, in Peterson, the custody

arrangement was determined by the court, rather than by agreement

of the parties, as is the case here.  We agree with the statement

by Justice Dunn in his dissent in In re Marriage of Carey, 188

Ill. App. 3d 1040, 1053, 544 N.E.2d 1293, 1301 (1989) (Dunn, J.,

dissenting), that an agreement by one spouse that the other

spouse have custody of their child is not tantamount to an aban-

donment or loss of interest in the child.  Nonetheless, while one

parent's agreement that the other receive custody should not be

dispositive on the issue of voluntary relinquishment, such an

agreement, and the reasons behind it, are factors which the court

can properly consider.

          Another factor courts look to when a parent allows

someone else to maintain physical possession of his/her child is

that parent's intentions and expectations when relinquishing the

child to the care of another.  See Peterson, 112 Ill. 2d at 54,

491 N.E.2d at 1153; Carey, 188 Ill. App. 3d at 1049, 544 N.E.2d

at 1298; Montgomery v. Roudez, 156 Ill. App. 3d 262, 509 N.E.2d

499 (1987).  One point the court found significant in Peterson

was that in the time the child lived with her mother and grand-

parents, it would not have occurred to the natural father that

the grandparents were developing a position of standing by living

with the child.  

          Here, Joan was aware of Marc's and Cindy's relationship

and knew that a mother-child relationship was developing between

Cindy and the children over the years.  Yet, even knowing that

strong bonds were forming between Cindy and the children, Joan

chose to live in distant states, visited with the children infre-

quently, and never attempted to have a court modify her custody

arrangement with Marc.  In relinquishing physical possession of

the children indefinitely and maintaining only an attenuated

relationship with them while they were being reared by Marc and

Cindy, Joan must reasonably have expected that parent-child rela-

tionships were developing between Cindy and the children.  This

is in contrast with Peterson, where the court found there was no

evidence a parental relationship had developed between the child

and her grandparents.  See Peterson, 112 Ill. 2d at 54, 491

N.E.2d at 1153.

          Even if we do not give significant weight to Joan's

custody agreement with Marc or her expectations as to the kind of

relationships that would result therefrom, there is substantial

additional evidence indicating that she voluntarily relinquished

custody of the children, which brings us to the most significant

difference between Peterson and the present case.  

          In Peterson, the court found it extremely significant

that the father had vigorously, regularly exercised his visita-

tion rights.  Peterson, 112 Ill. 2d at 54, 491 N.E.2d at 1153.   

In the present case, the evidence demonstrated that from Septem-

ber 1989 until after Marc's death in 1995, Joan visited with the

children only four times; specifically, in the summer of 1990,

the winter and summer of 1991, and the summer of 1992.  After the

visit in the summer of 1992, Joan did not again visit with the

children until March 1995, when she traveled to Illinois for the

hearing on temporary custody.  Joan did not contact Marc to re-

quest any visitation with the children in 1994.  This is despite

the fact that she had been granted liberal visitation rights and

Marc and Cindy had been cooperative in arranging visits in the

past.  We agree with the trial court's conclusion that Marc and

Cindy did not impede Joan in developing a relationship with the

children, as she has contended.

          Not only did Joan fail to exercise visitation regular-

ly, she also failed to maintain regular correspondence or tele-

phone contact with the children.  At the hearing, she admitted

that she did not telephone the children or write to them monthly,

or even bimonthly.  One fact which is indicative of the infre-

quency of contact between Joan and the children is that Joan at-

tempted to send a package to Tanya for her birthday in September

1994, only to discover Marc, Cindy, and the children had moved to

a new house four months earlier in June 1994.  

          As Justice Green observed in his special concurrence in

Gustafson, if a noncustodial parent continually shows interest in

a child and promptly seeks custody upon the death of the custodi-

al parent, courts will imply a constructive physical custody in

favor of the noncustodial parent.  Gustafson, 181 Ill. App. 3d at

481, 536 N.E.2d at 1364 (Green, J., specially concurring); see

Peterson, 112 Ill. 2d at 54, 491 N.E.2d at 1153.  Here, however,

the evidence demonstrated Joan failed to maintain the kind of

active and ongoing contact with the children as contemplated in

Peterson. 

          In addition to the specific rules the courts have fash-

ioned for custody situations where the custodial parent has died

or manifestly abandoned a child, the courts have indicated sever-

al factors which should be considered in making the determination

of whether a child is "not in the physical custody of one of his

parents."  750 ILCS 5/601(b)(2) (West 1994).  Such factors in-

clude (1) who was responsible for the care and welfare of the

child prior to the initiation of custody proceedings; (2) the

manner in which physical possession of a child was acquired; and

(3) the nature and duration of the possession.  In re Marriage of

Santa Cruz, 172 Ill. App. 3d 775, 783, 527 N.E.2d 131, 136

(1988); In re Marriage of Sechrest, 202 Ill. App. 3d 865, 871,

560 N.E.2d 1212, 1215 (1990); see also In re Custody of Menconi,

117 Ill. App. 3d 394, 398-99, 453 N.E.2d 835, 839 (1983);

Barokas, 109 Ill. App. 3d at 543, 440 N.E.2d at 1041; In re Mar-

riage of Nicholas, 170 Ill. App. 3d 171, 178, 524 N.E.2d 728, 733

(1988).

          While the supreme court indicated in Kirchner no combi-

nation of these factors is sufficient to confer standing on a

nonparent if there has not been a voluntary relinquishment of

custody by the parent (Kirchner, 164 Ill. 2d at 493, 694 N.E.2d

at 335-36), we find that all of the above factors are relevant to

the determination of whether there has been voluntary relinquish-

ment.  An analysis of the above factors is necessary because,

aside from a situation of abandonment, a parent does not typi-

cally state "I hereby voluntarily, indefinitely relinquish cus-

tody of my child," although her actions and the surrounding cir-

cumstances may indicate that is exactly what she is doing. 

          Menconi, which was cited with approval in Peterson,

provides an example of when a parent may be deemed to have volun-

tarily relinquished physical custody of his child.  There, the

child's natural mother died shortly after the birth of the child

and the father placed the child in the home of his parents.  The

daughter lived with the grandparents for 6½ years before the

father returned and attempted to regain custody forcibly.  In the

6½ years, the father had reclaimed physical possession of the

child several times, for periods of a few weeks, but invariably

returned the child to his parents' care.  Menconi, 117 Ill. App.

3d at 395, 453 N.E.2d at 836-37.  Examining the above factors,

the court found that based upon the voluntary nature of the

father's transfer of the child to his parents, and the length of

time he left her with them, he had relinquished custody indefi-

nitely and, therefore, did not have physical custody of her when

the custody petition was filed.  Menconi, 117 Ill. App. 3d at

398-99, 453 N.E.2d at 839.   

          In contrast is Barokas (109 Ill. App. 3d 536, 440

N.E.2d 1036), where the mother placed her child in the temporary

care of the child's adult sister and the sister then turned the

child over to a third party without the mother's permission. 

Once in possession of the child, the third party filed for custo-

dy under section 601(b)(2) of the Act.  The court held the mother

had never relinquished physical custody of the child within the

section's meaning and, therefore, the third party did not have

standing to seek custody.

          The case most factually similar to the present contro-

versy is Carey.  There, as in the present case, the natural moth-

er agreed in the dissolution action that the father be awarded

permanent custody of their child.  Carey, 188 Ill. App. 3d at

1042, 544 N.E.2d at 1294.  Later, the father remarried and peti-

tioned the court to remove the child from Illinois to Virginia,

where he and his new wife had been transferred.  The natural

mother did not contest the removal of the child from the state. 

The father later died and when the natural mother sought a modi-

fication of the custody agreement, the stepmother asserted a

claim for custody which the natural mother contested, arguing the

stepmother lacked standing.

          In making its determination on standing, the court

noted that in the agreement incorporated into the judgment order

of dissolution, the natural mother gave permanent legal custody

of the child to his father.  Carey, 188 Ill. App. 3d at 1042-43,

544 N.E.2d at 1294.  Primarily based on this fact, and the fact

that the natural mother did not contest the child's move out of

state, the court found the child's natural mother had previously

voluntarily relinquished physical custody of him.  Carey, 188

Ill. App. 3d at 1049, 544 N.E.2d at 1299.  The court further

found that although the natural mother had exercised her visita-

tion rights frequently, she had not provided for the care, custo-

dy, and welfare of the child in such a manner that, when the fa-

ther died, she was vested with physical custody.  Carey, 188 Ill.

App. 3d at 1049, 544 N.E.2d at 1299.  The court stated upon the

death of the father, custody of the child did not automatically

revert to the natural mother; rather, the proper procedure was

for her to file a petition for modification of custody under

section 610 of the Act (750 ILCS 5/610 (West 1994)) so the court

could determine custody according to the best interest of the

child.  Carey, 188 Ill. App. 3d at 1051, 544 N.E.2d at 1300.  

          This is despite the fact that the court found the natu-

ral mother had frequently exercised her visitation rights, in-

cluding 18 overnight visits within the first year after the

child's move out of state, and that visitation continued in that

manner until the father died, three years later.  Carey, 188 Ill.

App. 3d at 1043, 544 N.E.2d at 1294.  

          The only notable distinctions between Carey and Peter-

son are (1) the natural mother in Carey did not seek custody in

the dissolution proceeding; and (2) the natural mother and the

child lived a significant distance from each other in Carey, re-

sulting in less frequent visitation than the father in Peterson

enjoyed.  The Carey court seemed to place great significance on

the fact that the natural mother agreed to the father's custody

of the child and the move out of state.  (However, we do not find

that such agreements, in and of themselves, are sufficient to

constitute voluntary relinquishment of physical custody.)  Last,

the court found it significant that the stepmother had provided

for the care and welfare of the child for several years prior to

the action for custody modification.  

          Applying the facts of the present case to the first of

the three factors recited in Santa Cruz, above, the record is

clear that Cindy and Marc were responsible for the care and wel-

fare of the children prior to the initiation of this custody

proceeding.  Joan had been living in either California, Colorado,

or Wyoming since the parties separated in 1988, and has not been

responsible for the care of either child since at least September

1989.

          With respect to child support, Joan did pay Marc one

lump sum of approximately $36,000 in 1988, after receiving an

inheritance of approximately $250,000, which she expected would

satisfy her support obligations as to Shane through his minority. 

In the September 1989 order modifying custody, Joan was ordered

to pay Marc $200 per month per child.  Joan paid Marc nothing

toward Tanya's support in 1989 or 1990, $900 in 1991, $400 in

1992, $600 in 1993, $250 in 1994, and nothing in 1995.  Joan tes-

tified regarding her finances and, although the evidence demon-

strated she is not adept at managing her money, her actions over

the years also indicated she did not consider her child support

obligation a high priority.  The evidence clearly demonstrated

Marc and Cindy were responsible for the financial support of the

children and provided for their care and welfare since 1990.

          With respect to the second factor, Marc and Cindy ac-

quired physical possession of the children as a result of the

agreement between Joan and Marc with respect to Shane and by

Joan's subsequent voluntary transfer of Tanya to Marc in Septem-

ber 1989.  Joan alleged this transfer was primarily due to health

problems she was having at the time.  However, her testimony es-

tablished these "health problems" were merely hives or skin le-

sions occasioned by stress.   

          Finally, the nature of the relationship between Cindy

and the children has been one of mother-children and has been an

ongoing, developing relationship since 1990.  Although Joan did

exercise visitation rights in 1990, 1991, and 1992, the trial

judge characterized her relationship with the children as one of

a "distant relative."  

          The evidence before the court established Joan volun-

tarily relinquished custody of her children indefinitely, within

the meaning of section 601(b)(2) of the Act; thus, they cannot be

said to have been in the custody of one of their parents when

Cindy filed her petition for custody.  Joan's failure to visit

the children in the 2½ years preceding this custody action, fail-

ure to maintain regular contact with the children, and failure to

regularly make child support payments all demonstrate the chil-

dren were not in the physical custody of Joan when Cindy filed

her petition.   

          Joan's argument that she relinquished custody to Marc

but not to Cindy is unpersuasive.  Cindy and Marc attended to all

of the children's needs in the five years preceding this action

and Cindy effectively assumed the role of mother to Joan's chil-

dren.  Joan fully supported such an arrangement and never at-

tempted to augment the role she played in her children's lives. 

          Finally, we reject Joan's suggestion that we should

look to her acts after, rather than before, Marc's death in de-

termining whether she voluntarily relinquished custody.  Whether

a party has standing under section 601(b)(2) of the Act is deter-

mined by examining that party's status as of the date relief is

sought.  See In re Marriage of Roberts, 271 Ill. App. 3d 972,

981-82, 649 N.E.2d 1344, 1351 (1995).  Cindy filed her petition

for custody on the day Marc died; therefore, the question was

whether, as of January 10, 1995, Joan had relinquished physical

custody of the children.  As concluded above, she had.  Her ac-

tions since that date are irrelevant to the issue of Cindy's

standing.  For the foregoing reasons, the judgment of the circuit

court is affirmed.

          Affirmed.

          COOK, P.J., specially concurs.

          McCULLOUGH, J., specially concurs.

          PRESIDING JUSTICE COOK, specially concurring:

          I agree with the majority's disposition of this case,

but I believe its reasoning is too restricted.  In my view, the

surviving spouse of a custodial parent should generally have

standing to seek custody under section 601(b)(2) of the Act, even

if that surviving spouse is not related by blood to the child. 

750 ILCS 5/601(b)(2) (West 1994).

          In Carey, the court found that a stepmother, the widow

of the custodial father, had standing for two reasons:  (1) a

mother-son relationship existed between the stepmother and the

child, and (2) the natural mother had voluntarily relinquished

legal custody and agreed to the child's move out of state.  Car-

ey, 188 Ill. App. 3d at 1049, 544 N.E.2d at 1299.  The dissent in

Carey was critical of the court's reliance on factor (2).  Making

that factor the determinant "would only serve to discourage

amicable settlement of custody matters in dissolution proceed-

ings."   Carey, 188 Ill. App. 3d at 1053, 544 N.E.2d at 1301

(Dunn, J., dissenting).  

          In Kirchner, the supreme court further considered the

standing requirement, which is found in the statutory language

that a nonparent may petition for custody of the child "only if

he is not in the physical custody of one of his parents."  750

ILCS 5/601(b)(2) (West 1994).  Kirchner stated, "[t]he determina-

tion that a parent does not have physical custody of a child

turns not on possession; rather, it requires that that parent

somehow has voluntarily and indefinitely relinquished custody of

the child."  Kirchner, 164 Ill. 2d at 491, 649 N.E.2d at 335. 

That language from Kirchner does seem to focus on factor (2), the

conduct of the noncustodial biological parent, but Kirchner is a

very different case on its facts from Carey.  As the supreme

court pointed out in Kirchner, "[i]n simple terms, Richard is in

the Does' home without color of right."  Kirchner, 164 Ill. 2d at

492, 649 N.E.2d at 335.  The same cannot be said of a child whose

custody has been awarded to one parent in a dissolution of mar-

riage proceeding, even where the other parent has objected to

that award.  In the present case, the children were not in Cin-

dy's home "without color of right."  In my view, the fact that

the parties have submitted their custody dispute to the dissolu-

tion court, and that court has awarded custody, satisfies the

Kirchner requirement that there be a "voluntary relinquishment." 

Kirchner cited Carey with approval.  Kirchner, 164 Ill. 2d at

492, 649 N.E.2d at 335.  

          Imagine a situation where the parents are divorced

shortly after the child's birth, the father receives custody,

then remarries, and the stepmother raises the child until he is

10 years old.  If the natural mother did not agree to custody,

and visits the child every few months (which the court finds to

be reasonable under the circumstances), then under the majority's

rule the court cannot even consider whether custody in the step-

mother is in the best interest of the child.  That is so even if

the stepmother is the only mother the child has ever known. 

Perhaps custody in the natural mother would be an appropriate

result in some such cases, but it is not the result which should

be mandated in all cases, and I do not read Kirchner to require

it.  

          I agree with the Carey dissent that we should not dis-

courage the amicable settlement of custody matters.  In my view,

Cindy should have standing in this case even if Joan had not

entered into the marital settlement agreement, even if Joan had

not asked Marc to take custody of Tanya, and even if Joan had

been able to exercise visitation more frequently.  A court should

not have to find that the natural mother is a bad person in order

to find standing on the part of the stepmother.  Because of the

mother-child relationship in this case which developed over a

period of five years, with color of right, the court should at

least consider whether an award to Cindy is in the best interests

of the children.  Cindy is not an intermeddler in the affairs of

these children.  

          If Cindy is found to have standing and the case is

decided under the best interest of the child standard, the court

will still give considerable weight to the right of the natural

parent.  In re Custody of Townsend, 86 Ill. 2d 502, 508, 427

N.E.2d 1231, 1234 (1981).  The first factor listed under the best

interest of the child standard is "the wishes of the child's

parent or parents as to his custody[.]"  750 ILCS 5/602(a)(1)

(West 1994).  

          I disagree with the Carey dissent that the only differ-

ence between that case and Peterson was that in Peterson the

noncustodial parent contested custody during the dissolution

proceedings.  I agree with the Carey majority which looked to

factor (1), the relationship between the grandparents and the

child.  "Although the grandparents in Peterson provided a home

and helped their ailing daughter care for the child, there was no

indication that the grandparents had established any parental

relationship with the child."  Carey, 188 Ill. App. 3d at 1050,

544 N.E.2d at 1299.  In Peterson, "Lynette was in the sole care

of the Jadrychs only through the fortuitous occurrence of

Felicia's death" at a time Felicia happened to be living with the

Jadrychs.  Peterson, 112 Ill. 2d at 54, 491 N.E.2d at 1153.      

          JUSTICE McCULLOUGH, specially concurring:

          I agree with the determination that Cindy did have

standing to petition for custody of the stepchildren.

          I write separately only with respect to the weight to

be given to the custody agreement and our approval of Carey.

          It is important that the court give little weight to

the custody agreement between Marc and Joan.  The agreement was

clearly in the children's best interests.  We should and do en-

courage parents to help the trial courts settle custody.  Parents

who set aside a self-centered, parent ego, in favor of what is in

the best interests of their children should not be penalized. 

The noncustodial parent should not be in a weaker position in the

event the custodial parent becomes deceased or incapacitated.  A

mother's conscientious and reasonable decision relinquishing

custody to the father is not reason to deny her custodial rights

when the father becomes deceased.  Voluntary relinquishment must

be based upon other evidence.  I agree there is sufficient other

evidence to determine Cindy has standing.  I do have concern that

Cindy and Marc planned this proceeding as evidenced by the peti-

tion being filed the day Marc died.  The evidence does not show,

however, that Marc and Cindy impeded Joan in any way in maintain-

ing her relationship with the children.

          These cases are fact specific.  Although I agree with

the trial court here, I do not necessarily endorse the reviewing

court's decision in Carey.