Second Division
 May 13, 1997




 No. 1-95-4007


KAREN FRANKLIN, ) Appeal from the
 ) Circuit Court of
 Plaintiff-Appellee, ) Cook County.
 )
v. ) 
 )
RICHARD DEVRIENDT, ) No. 93 D 79628
 ) 
 Defendant-Appellee, )
 )
v. )
 )
SANDRA FURMAN and RICHARD FURMAN, ) Honorable
 ) R. Morgan Hamilton,
 Intervenors-Appellants. ) Judge Presiding.


 JUSTICE TULLY delivered the opinion of the court:
 Intervenors Sandra and Richard Furman appeal from an order
of the circuit court denying them leave to intervene and file a
petition for legal guardianship of their granddaughter, Roxanne
DeVriendt. 
 Roxanne DeVriendt was born on September 15, 1992. Her
natural parents, plaintiff Karen Franklin and defendant Richard
DeVriendt, were not married to each other and did not reside
together. On or about November 13, 1992, upon agreement between
plaintiff and Sandra Furman, Roxanne went to live with
intervenors, Roxanne's paternal grandmother and step-grandfather. 
On August 3, 1993, the trial court entered an order, pursuant to
a joint petition filed by plaintiff and defendant, establishing
defendant's paternity and awarding joint custody of Roxanne to
plaintiff and defendant. In July 1994, intervenors filed a
petition for legal guardianship of Roxanne. Rather than pursuing
this petition, however, intervenors subsequently filed a motion
to vacate the August 3 order and sought to intervene and petition
the court for custody of Roxanne. Plaintiff then filed a
petition for modification of custody seeking an award of sole
custody of Roxanne. During the proceedings, the court ordered
that Roxanne was to remain with the intervenors and granted
plaintiff weekly visitation. The trial court appointed a
guardian ad litem and attorney for Roxanne. At the conclusion of
a hearing on the issue of whether intervenors had standing to
intervene and seek custody of Roxanne pursuant to section 601(c)
of the Illinois Marriage and Dissolution of Marriage Act (750
ILCS 5/601(c)(West 1994)), the trial court concluded that the
intervenors did not have physical custody of Roxanne and
therefore lacked standing.
 At the hearing, the parties entered by stipulation the
deposition testimony of plaintiff and Sandra Furman. The court
also heard testimony. The evidence established that Sandra
Furman ("Furman") first became aware that plaintiff and defendant
had a child together approximately six days after Roxanne was
born. Thereafter, Furman began visiting Roxanne at plaintiff's
apartment every two to three days. At the time plaintiff was
living in a two bedroom apartment with her five other children,
three grandchildren and a niece. Furman testified that when she
visited, she brought food, clothing and other necessities for
Roxanne because plaintiff did not have these items. 
 On November 13, 1992, Furman went to plaintiff's apartment
at defendant's urging because there had been no electricity in
the apartment for several days. When Furman and defendant
arrived, there was no electricity, and plaintiff was attempting
to heat the apartment by lighting the stove burners. Furman
offered to care for Roxanne until plaintiff was able to rent a
new apartment. Plaintiff agreed and sent Roxanne and all of her
belongings with Furman. 
 From November 1992 until about May 1994, defendant babysat
for Roxanne during the days, while intervenors were at work. 
Defendant did not reside with intervenors. After May 1994,
Furman quit her full time job and began working part time in the
evenings and on weekends. Furman then cared for Roxanne during
the day, and her husband or daughter cared for Roxanne while she
worked. After defendant stopped babysitting daily, he continued
to visit Roxanne, approximately twice per week. Defendant paid
intervenors $60 to $100 per month until October 1994. He also
told intervenors that he would take Roxanne when he was working
and had an apartment.
 Furman testified that plaintiff visited Roxanne once every
two or three weeks, for two to three hours per visit, until
Roxanne was five or six months old. Then plaintiff's visits to
Roxanne decreased to about once a month, primarily on holidays. 
During the summer of 1993, plaintiff began skipping months
without a visit. Plaintiff had an overnight visit with Roxanne
in April 1993. Furman testified that the decrease in plaintiff's
visits came after Roxanne was diagnosed with a birth defect in
her left optic nerve, which required that the child wear an eye
patch eight hours per day. Plaintiff never asked Furman to
return Roxanne to her. Plaintiff once offered to buy diapers,
but Furman told her to keep the money to get an apartment and
furniture. 
 When Roxanne was six months old, she was diagnosed with a
birth defect to her left optic nerve. Plaintiff accompanied
Furman to the doctor when Roxanne received her inoculations, but
did not attend any doctor appointments related to the eye
condition. Roxanne was insured under plaintiff's insurance
policy until July 1994, when the Furmans transferred Roxanne to
Richard Furman's insurance policy because plaintiff was in danger
of losing her job. 
 Furman testified that she was not aware of the joint custody
order entered on August 3, 1993, until intervenors filed their
petition for legal guardianship of Roxanne. At that time,
defendant informed her of the custody order. Furman testified
that she and her husband petitioned for legal guardianship of
Roxanne because they had been caring for Roxanne for two years
and contemplated caring for her until the age of 18. Furman
wanted legal guardianship so that she would be able to take
Roxanne to the doctor and sign for medical procedures. Furman
testified that Roxanne calls intervenors "grandma" and "grandpa,"
but later testified that Roxanne has attempted to call her
"mommy."
 Plaintiff testified that she allowed Furman to take Roxanne
because she was having problems at work, arriving late or not at
all when she had babysitting difficulties. She was also having
difficulty with defendant, who was threatening that if Roxanne
was hurt, he would harm plaintiff's other children. Plaintiff
indicated that her agreement with the intervenors was that she
and defendant would try to find an apartment together and that,
when they did, she would come and get Roxanne. 
 Plaintiff testified that between November 1992 and August
1993, when she and defendant filed a petition to establish
paternity, she visited Roxanne "on my off days and on weekends
and sometimes not on my off days." Between August 1993 and July
1994, she visited as often as she could and tried "to get out
there at least once a week." Plaintiff gave money to defendant
for Roxanne's care, but on the several occasions she attempted to
give Furman money, Furman would not accept it. 
 Plaintiff testified that she moved into a new apartment in
August 1993. She asked defendant for Roxanne, but defendant
refused and threatened her. Plaintiff and Furman both testified
regarding an incident which occurred when Roxanne was about six
months old. Defendant and Furman had taken Roxanne to visit
plaintiff. Plaintiff demanded that defendant leave Roxanne with
her. Defendant refused, put Roxanne in the car and instructed
Furman to drive away. Furman testified that on that occasion
defendant informed her that plaintiff was drunk, and plaintiff
was screaming and pounding on the car. Subsequent to these
incidents, plaintiff had overnight visitations with Roxanne and
always returned Roxanne to the Furmans. On cross-examination,
plaintiff stated that she never asked Sandra or Richard Furman to
return Roxanne to her. 
 The trial court found that intervenors had physical
possession rather than physical custody of Roxanne and that
Roxanne had remained in the physical and legal custody of both
her parents at all times. The trial court specifically found
that it was defendant who initiated intervenors' involvement in
caring for the child and that defendant played a major role in
the child's life, which included providing regular child care and
monetary support. The court found that plaintiff had an
agreement with defendant rather than intervenors and intervenors
were acting upon direction of defendant. Therefore, the court
determined it was appropriate for plaintiff to direct her
requests for Roxanne's return to defendant. 
 Section 601 of the Illinois Marriage and Dissolution of
Marriage Act allows a non-parent to file a petition for custody
of a child only if the child "is not in the physical custody of
one of his parents." 750 ILCS 5/601(b)(2)(West 1994). For
purposes of determining who has physical custody of the child,
courts do not solely look at who has physical possession of child
at time of filing. In Re Custody of Peterson, 112 Ill. 2d 48, 54
(1986). Instead, the courts also consider how that possession
came about and the nature and duration of the possession. In re
Marriage of Carey, 188 Ill. App. 3d 1040, 1048 (1989). The
courts have also looked to who is providing for the child's care,
custody and welfare. In re Marriage of Kulawiak, 256 Ill. App.
3d 956, 962 (1993). In order for a non-parent to have physical
custody of the child, the parents must have "voluntarily and
indefinitely relinquished custody of the child." In re Petition
of Kirchner, 164 Ill. 2d 468, 491 (1995). The party seeking to
intervene bears the burden of establishing standing. In re
Marriage of Sechrest, 202 Ill. App. 3d 865, 870 (1990). Once
standing has been established, the court will apply the best
interests of the child standard in resolving the custody dispute. 
750 ILCS 5/602 (West 1994). A reviewing court will disturb an
order entered by the trial court in a custody proceeding only if
the order was against the manifest weight of the evidence or will
result in a manifest injustice. In re Custody of McCuan, 176
Ill. App. 3d 421, 427 (1988). 
 In summary, a non-parent seeking standing under section
601(b) must establish that the child is in the physical custody
of a non-parent, which necessarily requires that both of the
child's parents must have voluntarily relinquished custody of the
child. That is not so in the instant case. 
 Intervenors rely on In re Custody of Menconi, 117 Ill. App.
3d 394 (1983), where the child's father asked his parents to care
for his infant son, whose mother had died. The grandparents
cared for the child for six years, except for short intervals
during which they returned the child at the father's request. 
After the child's father forcibly removed her from the
grandparents' home, they filed a petition for custody. Menconi, 
117 Ill. App. 3d at 395. The court found that the father had
voluntarily relinquished custody of his daughter, noting the
voluntary nature of the initial transfer, the length of time the
grandparents cared for the child, the child's integration into
the grandparents' home and the father's sporadic contact with the
child. Menconi, 117 Ill. App. 3d at 398. 
 In this case, plaintiff did allow intervenors to care for
Roxanne. However, there was ample evidence that the parties
intended this to be a temporary situation in order to allow
plaintiff to obtain a more suitable apartment for raising the
child. In addition, both parents maintained contact with the
child during this time. Defendant cared for the child on a daily
basis from November 1992 to May 1994 and provided financial
support as well. While the frequency of plaintiff's visits is
disputed, she clearly did visit the child. Both Furman and
plaintiff testified that Roxanne was aware that plaintiff was her
mother. Plaintiff also gave defendant money and items for the
child's care. Furman refused to accept money from plaintiff. 
Furthermore, when plaintiff did move into a new apartment,
approximately eight months after Roxanne went to live with
intervenors, defendant refused plaintiff's request to return
Roxanne. Based on defendant's daily contact with Roxanne and
relationship with intervenors, plaintiff was justified in
directing her requests for Roxanne's return to defendant. 
 In In re Marriage of Dile, 248 Ill. App. 3d 683 (1993), the
child's mother had been awarded custody in divorce proceedings. 
The father maintained contact with his daughter even after moving
out of state. After the child's mother committed suicide, the
child's maternal grandparents took her to their home and refused
to relinquish her to her father. The father agreed to allow his
daughter to remain with the grandparents at that time because of
the trauma she had suffered, but continued to assert that he
wanted custody of her. Seven months later, the grandparents
filed a petition for custody. Dile, 248 Ill. App. 3d at 683-84. 
The court held that the grandparents did not have physical
custody of the child as required to establish standing under
section 601(b)(2) (750 ILCS 5/601(b)(2)(West 1994)), noting that
the record indicated the father had only allowed the grandparents
to maintain "temporary care" of his daughter. Dile, 248 Ill.
App. 3d at 685-86.
 Just as the grandparents in Dile could not confer standing
upon themselves by refusing to relinquish the child to her
father, intervenors in the instant case cannot gain standing
where defendant had refused plaintiff's requests for Roxanne's
return. The father in Dile maintained contact with his daughter
and indicated that, while he would allow the grandparents to
temporarily care for her, he wanted custody. In the instant
case, both parents maintained contact with Roxanne. Plaintiff
and intervenors agreed that the situation was meant to be
temporary, and both parents had indicated that when they were
able they would like to care for Roxanne.
 Intervenors also rely on In re Custody of Bozarth, 182 Ill.
App. 3d 345 (1989), where the court found that the paternal
grandmother had standing to petition for custody of her
granddaughter. However, in Bozarth, the grandmother had been
caring for the child for approximately three years. The
whereabouts of the child's mother, who had abandoned the child as
an infant, were unknown, and the child's father lived in another
state. Bozarth, 182 Ill. App. 3d at 352. In contrast,
intervenors had physical possession of Roxanne for about 20
months before initiating these proceedings. During that time,
both parents visited the child and contributed financially to her
care and they both indicated they planned to take Roxanne when so
able. We find that under these circumstances, the trial court's
finding that neither plaintiff nor defendant voluntarily
relinquished custody of Roxanne to the Furmans as required by
section 601(c) was not contrary to the manifest weight of the
evidence.
 Accordingly, the judgment of the circuit court is affirmed.
 Affirmed.
 DiVITO, P.J., and RAKOWSKI, J., concur.